MAINE SUPREME JUDICIAL COURT                                Reporter of Decisions
Decision:     2015 ME 88
Docket:       Kno-14-187
Argued:       May 14, 2015
Decided:      July 21, 2015

Panel:        ALEXANDER, MEAD, GORMAN, and CLIFFORD, JJ.

STATE OF MAINE

v.

DENNIS J. DECHAINE

MEAD, J.

[¶1]   Dennis J. Dechaine appeals from a judgment of the Superior Court (Knox County, *Bradford, J.*) denying his motion for a new trial, which was brought pursuant to the post-conviction DNA analysis statute, 15 M.R.S. §§ 2136-2138 (2014).   Dechaine contends that the court erred or abused its discretion in (1) finding that the new DNA evidence admitted at the hearing, "when considered with all the other evidence in the case, old and new," did not make it probable that a different verdict would result from a new trial, *id.* § 2138(10)(C)(1); (2) limiting the evidence that could be presented at the hearing to evidence concerning the new DNA testing and analysis; and (3) denying his motion to recuse.   We affirm the judgment.

## I.  BACKGROUND

[¶2]  In 1989, Dechaine was convicted of the kidnapping, sexual assault, and murder of twelve-year-old Sarah Cherry.  *State v. Dechaine*, 572 A.2d 130, 131-32 (Me. 1990), *cert. denied*, 498 U.S. 857 (1990).  We have addressed the case three times before today: *id.* (direct appeal); *State v. Dechaine*, 630 A.2d 234 (Me. 1993) (affirming the trial court's denial of Dechaine's motion for a new trial based on newly discovered evidence); and *State v. Dechaine*, 644 A.2d 458 (Me. 1994) (affirming the trial court's order requiring Dechaine to return certain trial exhibits).  In two of those decisions we summarized portions of the evidence heard by the jury at Dechaine's trial, concluding that "[b]ased on all the evidence, the jury's conclusion that Dechaine was guilty beyond a reasonable doubt of all charges submitted to it was rational."  *Dechaine*, 572 A.2d at 131-32 & n.3; *see Dechaine*, 630 A.2d at 236-37.

[¶3]  In 2000, the United States District Court for the District of Maine (*Carter, J.*) denied Dechaine's petition for a federal writ of habeas corpus, affirming the recommended decision of United States Magistrate Judge David M. Cohen.  *Dechaine v. Warden*, 2000 WL 33775285 (D. Me. Nov. 21, 2000), *aff'g Dechaine v. Warden*, 2000 U.S. Dist. LEXIS 12289, 2000 WL 1183165 (D. Me. July 28, 2000).  Because the Superior Court's judgment in the case at bar rested in part on its finding that "as several other courts

have found, the evidence of Dechaine's guilt is substantial," we think it useful, before discussing the facts specific to Dechaine's current motion for a new trial, to begin with Magistrate Judge Cohen's extensive review of that evidence insofar as it is relevant to this appeal.[1]

### A. Pre-Trial Motion To Obtain DNA Evidence

On January 26, 1989[,] Dechaine, through counsel Thomas J. Connolly, filed a motion for a continuance and permission to conduct DNA testing, then "a radical and new technique," on fingernail clippings taken from Cherry's body. The court promptly scheduled a hearing at which Judith Brinkman, a forensic chemist with the Maine State Police Crime Lab, testified and explained the forensic significance of DNA testing. Brinkman testified that in contrast to traditional serological testing methods, DNA "should be like a fingerprint, much more discriminating from one person compared to another except for in identical twins because identical twins have the exact same DNA." There were three methods of DNA testing; the method that Connolly proposed to use was known as "polymerase chain reaction," or "PCR," then conducted only by one laboratory in California (which had a three- to four-month backlog) and in the "research stages" at the FBI laboratory.

Brinkman testified that she had been provided with ten fingernail clippings obtained during Cherry's autopsy and had used up eight of them (all but the thumbnails) to perform blood-typing tests. The blood adhering to the nails was found to be human blood containing A and H antigens, consistent with type A blood but also possibly resulting from a mixture of bloods of type A and/or type O. The blood on the nails could not have been contributed by someone with type AB or B blood; however, that ruled out a relatively small percentage of the population inasmuch as persons with type A blood

---

[1] Magistrate Judge Cohen's recommended decision includes complete record citations for each of the facts he recited, which, because they are readily obtainable, we have omitted for the ease of the reader.

comprised forty-one percent of the population and persons with type O forty-five percent.

Brinkman had tested the whole blood of both Dechaine and Cherry, determining that of Dechaine to be type O and that of Cherry to be type A. She theorized that the blood on the nails was solely that of Cherry, noting that Cherry's hands were found bound and positioned near her neck, which had been bleeding. She further explained, "There was nothing that led me to believe that there was a mixture [of bloods]. If someone had scratched someone hard enough to make them bleed and cause crust underneath the fingernails, you would expect to find tissue, some type of skin material or something indicating that there you know, that there had been scratching or you would expect to find some type of trauma to the nail such as broken nails or something like that and there didn't they didn't appear to be that way."

Brinkman reported that she had spoken with Jennifer Mehavolin of the California testing laboratory, who had advised that based on the small amount of blood available on the thumbnail clippings, it did not "sound like the possibility of getting good results." In Brinkman's opinion, high heat and humidity at the time of the murder also could have degraded the DNA. At the conclusion of the hearing the motion to continue for purposes of performing DNA testing was denied.

**B. Trial**

Venue in the case was changed to Knox County, Maine, where Dechaine was tried from March 6-18, 1989[,] with Superior Court Justice Carl O. Bradford presiding.

Testimony at trial revealed that John and Jennifer Henkel of Lewis Hill Road, Bowdoin, hired Cherry, a twelve-year-old girl who had just finished sixth grade, to babysit their ten-month-old infant on Wednesday, July 6, 1988. Cherry's mother, Debra Cherry Crossman, reminded her daughter the previous evening (as she always told her children when leaving) not to let anyone into the house or to inform any caller that she was alone. Only Cherry's mother, stepfather,

Christopher Crossman, sister Hillary, great-grandmother and friend Julie Wagg knew she was babysitting that day. At noon Jennifer Henkel called home and spoke with Cherry, who said that she was feeding the baby and about to fix herself some lunch.

Holly Johnson, a neighbor across the street from the Henkels, testified that at approximately 1 p.m. she heard a vehicle slowing down at the Henkels' driveway and heard the Henkel dogs barking. About fifteen minutes later she saw a red Toyota truck heading northbound. She could not be sure that the two vehicles were the same or that the truck was in fact a Toyota.

Jennifer Henkel arrived home at about 3:20 p.m. She immediately noticed some papers[,] a little looseleaf notebook and a car-repair bill in the driveway and picked them up. She found both the garage-level and upper-level doors to the house, which she had left unlocked but closed, slightly ajar. Upon entering she saw the television set turned on, Cherry's eyeglasses folded neatly in a rocking chair and her blue-jean jacket, sneakers and socks in a little neat pile next to a couch. Nothing seemed disturbed, misplaced or damaged. The baby was asleep in her crib, but Cherry was nowhere to be found. After a half-hour of fruitless searching an increasingly frantic Jennifer Henkel called police. Following his arrival home from work at between 3:30 p.m. and 3:45 p.m. John Henkel noticed what he thought was an unusual tire impression in the driveway and set some rocks around it to preserve it.

Sometime between 4:20 p.m. and 4:49 p.m. Leo Scopino and Daniel Reed, deputy sheriffs with the Sagadahoc County Sheriff's Department, responded to Henkel's call. Jennifer Henkel showed them the car-repair bill and notebook she had found in the driveway. The car-repair bill had the name "Dennis Dechaine" on top of it and described damage to a 1981 Toyota pickup truck. Neither the Henkels nor Cherry's mother ever had heard of Dechaine.

Scopino and Reed found a phone-book listing for a Dennis Dechaine on Old Post Road in Bowdoinham and drove to the residence, arriving sometime after 5 p.m. Dechaine was not there, but the officers spoke to his wife. As the evening wore on, additional

police officers became involved in a search for Cherry, Dechaine or Dechaine's vehicle. A command post was set up at the corner of Lewis Hill and Dead River roads.

Arthur Spaulding, whose house is set back in the woods about five or six hundred feet off of Dead River Road, testified that sometime that evening between 8 and 8:30, after he had started his generator, he saw a man in a blue polo shirt who appeared to be in his twenties walk past his window in the direction of Dead River Road.

At about 8:45 p.m. Helen Small Buttrick of Dead River Road, who was driving home with her husband Harry, spotted a man walking across the lawn of her mother's home, which was about seven hundred feet from the Buttricks' residence. The Buttricks stopped and asked the man, who turned out to be Dechaine, what he wanted. Dechaine told the Buttricks he had been fishing and could not find his truck. Harry Buttrick offered to help Dechaine find it following a brief stop at the Buttrick home. Helen Buttrick, who noticed nothing unusual about Dechaine's behavior, asked him where he lived. Dechaine responded that he lived in Yarmouth, was visiting in Bowdoinham "and sort of on the side he said I should have stayed there." He also said that he had been in the woods for two hours and had followed the sound of a generator and come out. Dechaine left with Harry Buttrick to look for his truck.

At about 9 p.m. Mark Westrum, a detective with the Sagadahoc County Sheriff's Department, and Deputy John Ackley reported to the command post at the intersection of Lewis Hill and Dead River roads. Within thirteen minutes Ackley received a call from Helen Small Buttrick advising that her husband was driving with a man who stated that he had lost his pickup truck. Ackley and Westrum set off to find the Buttrick vehicle, which they quickly located. Buttrick suggested that the police might be able to help Dechaine find his vehicle, and Dechaine got into the back seat of the police cruiser.

Ackley and Westrum drove Dechaine to the command post, where Ackley exited the vehicle and Reed got in. Reed gave Dechaine a Miranda warning and explained that the police were investigating the disappearance of a twelve-year-old girl. Dechaine

stated that he had been fishing and lost his truck. According to Reed, Dechaine initially denied that the papers found in the Henkel driveway were his. He then acknowledged that they were his and stated that he kept them in the passenger seat of his truck. Dechaine and Reed engaged in a heated exchange over how the papers could have gotten into the Henkel driveway, after which Dechaine told Reed, "whoever grabbed the girl saw these, placed them up at the head of the driveway to set me up."

Following the questioning Westrum [patted] Dechaine down. He noticed a handprint, fingers pointing downward, on the back of Dechaine's shirt. Scopino also searched Dechaine. He found no weapons but observed a one-to-two-and-a-half inch scratch and circular bruise on Dechaine's inner left arm and a circular scratch on Dechaine's right knuckle, which appeared to be fresh. Scopino observed that Dechaine was trembling and his eyes were extremely large. He saw no blood on Dechaine's clothes.

Dechaine was moved to a different cruiser, in the process of which Westrum discovered Dechaine's keys placed underneath the seat behind which Dechaine had been seated. Dechaine then was taken on a search for his truck, which was located at approximately 12:05 a.m. on July 7th. The truck, a red Toyota pickup with damage to the right-hand fender, was locked. Dechaine consented to its removal and search.

At approximately 2:40 a.m. Dechaine was again questioned, this time by Maine State Police Detective Alfred Hendsbee. Hendsbee asked Dechaine point-blank if [he] had taken Cherry, to which Dechaine responded that he did not do it and never would do such a thing. Hendsbee examined Dechaine and noticed, in addition to a bruise on his arm and a muddy handprint on the back of his shirt, faint scratch marks in his kidney area on the right-hand side that had not drawn blood. Dechaine's pants appeared damp. Dechaine stated that he had made the handprint swatting flies and got the scratches walking through the woods. After being photographed at Bowdoinham Town Hall Dechaine was driven home at approximately 4 a.m.

8

In the early-morning hours of July 7th Maine State Police Trooper Thomas Bureau performed a search with a dog in the vicinity of Dechaine's truck. The dog picked up a track from the driver's door that headed in a northeasterly direction for approximately one hundred and fifty feet to the edge of a bog, made a loop and came back to the driver's door. Bureau casted the dog around the truck, and when he got to the passenger side he picked up a track that looped back in a westerly direction toward the Hallowell/Litchfield Road, crossed that road and continued in a westerly direction to a stream, crossed the stream and began to head in a southerly direction, at which point the dog stopped tracking. Bureau could not tell whether the tracks picked up from the driver and passenger side were the tracks of the same person. The truck was secured and taken to the Maine State Police crime lab in Augusta.

On July 7th Dechaine and his wife, Nancy Emmons, consulted with attorney George Carlton. Emmons testified that on that day, when a photograph of Cherry was shown on the television news, Dechaine exclaimed, "my God, I've never seen that girl before." He also remarked that he had never kidnapped anyone.

A search team discovered Cherry's body concealed under a pile of brush at about noon on July 8th. The body was found in a wooded area off of Hallowell Road approximately four hundred feet from the spot on the opposite side of the road where Dechaine's truck had been located. The distance from the Henkel residence on Lewis Hill Road north to the intersection of Dead River Road was about 1.9 miles; the distance from that intersection west on Dead River Road to Hallowell Road was about one mile; and the Dechaine truck was found about three-tenths of a mile north of that intersection off of Hallowell Road. The Spaulding residence was four-tenths of a mile west of the intersection of Dead River and Hallowell roads.

Dr. Ronald Roy, chief medical examiner for the State of Maine, supervised removal of the body and conducted an autopsy upon it. Cherry was found bound and gagged . . . . She had been grazed and stabbed repeatedly in the head, neck and chest by a sharp instrument (in Dr. Roy's opinion a small knife, like a penknife) and strangled with a scarf. She had died on July 6th, the precise time unknown.

Cherry's bound hands were positioned in front of her chest, just below her neck, and there was blood under her fingernails. Dr. Roy stated that he would not expect the blood to be that of her assailant inasmuch as even if she had scratched her assailant, "when you scratch somebody you don't come away with bloody fingernails." In Dr. Roy's opinion, the stab wounds were small enough that he would not have been surprised if no blood transferred to the assailant.

Following discovery of the body, at approximately 2 p.m. on July 8th Hendsbee drove to the Dechaine residence and found Dechaine and Emmons sitting on their porch. According to Hendsbee, Dechaine immediately approached the vehicle and stated, "I can't believe I could do such a thing. The real me is not like that. I know me. I couldn't do anything like that. It must be somebody else inside of me." Dechaine cooperated in the execution of a search warrant, saying, "do what you've got to do." Hendsbee testified that during the search Dechaine also said that he could not believe he killed this girl when he could not even kill his own chickens. Hendsbee asked Emmons whether Dechaine carried a knife. Emmons responded that he had a penknife on his key ring. Hendsbee then informed her that the knife was not on Dechaine's key chain. She was surprised.

Dechaine was arrested that afternoon and charged with the murder of Cherry. Westrum, who helped book Dechaine that day, testified that Dechaine became emotional, crying and sobbing and saying, "Oh my God; it should have never happened. . . . Why did I do this?" According to Westrum, Dechaine's comments at that time included the following: "I didn't think it actually happened until I saw her face on the news; then it all came back to me. I remembered it. . . . Why did I kill her? . . . What punishment could they ever give me that would equal what I've done." Dechaine was transferred that evening to Lincoln County Jail. Darryl Robert Maxcy, a Lincoln County corrections officer, testified that Dechaine said, "You people need to know I'm the one who murdered that girl, and you may want to put me in isolation." A second corrections officer who was also present, Brenda Dermody, recalled Dechaine having made a nearly identical statement.

Following removal of the body Bureau returned to the vicinity to confirm his suspicion that his dog had refused to continue tracking in the early-morning hours of July 7th because he had never scented a dead body and did not like the smell. The dog hesitated to go near the spot where the body had lain. Bureau estimated that during the earlier search the dog had stopped tracking approximately seventy-five to one hundred feet away from the body.

On July 8th the dog also discovered a piece of yellow rope on the ground two hundred and fifty eight feet from the location in which Dechaine's truck had been found and one hundred and forty five feet from the location of the body. Later testing revealed that the piece of rope used to bind Cherry's wrists, a piece of rope recovered from inside Dechaine's truck and the piece of rope found in the woods all had the same basic characteristics. The piece of rope found in the woods and that from Dechaine's truck matched exactly; they "were once one rope." The rope binding Cherry's wrists was too damaged to permit a conclusion whether there was an exact match with the rope found in the woods.

Four latent fingerprints were found on the surfaces of Dechaine's truck. One could not be identified; the other three matched those of Dechaine. No fingerprint of Cherry's was found on the numerous items inside the truck, nor any hair that matched hers. Nor was any blood found, except blood on a napkin that appeared to be old.

Dusting of the two doors and doorframes leading to the Henkel residence yielded two latent fingerprints, neither of which matched those of Dechaine or Cherry. The notebook and autobody-receipt were not tested for latent fingerprints in part because so many people had handled them. Scopino in addition had written in the notebook upon first responding to Jennifer Henkel's call[,] an admitted mistake. The tire imprint detected by John Henkel was found to have a design consistent with the tread design of the left front tire of Dechaine's truck. No conclusive determination was possible because of the faintness of the cast of the tire that the Maine Crime Lab had prepared and the relatively poor quality of the impression in the driveway.

No blood or unidentified hairs or fibers were found on the clothes Dechaine had been wearing on July 6th; however, they happened to have been laundered by the time police seized them. No blood, hairs or fibers matching any from Cherry's body (other than blue cotton of negligible probative value) were found under his fingernails. A pink synthetic fiber discovered on a tree near the body did not match fibers found on either Dechaine or Cherry.

Dechaine took the stand in his own defense at trial, denying that he had abducted, tied up, buried or killed Cherry. He also denied having confessed. Dechaine, who was thirty-one years old at the time of trial, testified that on the afternoon of July 6th he went to a wildlife refuge on Merry Meeting Bay where he injected a drug that he had purchased in a museum bathroom in Boston from a person who told him it was speed. He then took a route that led him to Hallowell Road, noticed a woods road and pulled into it. He wandered into the woods off the side of the road and injected more of the drug. Feeling "more lucid" and "more energetic," he wandered for some period of time in the Hallowell Road area, stopping frequently and finishing the remainder of the drug. At one point he was unable to find his truck, which may or may not ultimately have been found where he last left it. He did not believe that he had left it locked.

[Dechaine testified that] [a]t about dusk he followed the sound of a generator and came out to a dirt road. He lied to the Buttricks about where he was from and his activities that afternoon for fear that they would notice he was under the influence of drugs. He told the same lie (that he had been out fishing) to police for the same reason. He recalled having immediately acknowledged ownership of the auto-body receipt and notebook when presented with those items by Reed. He hid his keys from the police when he discovered them after mistakenly informing the police that he had left them in his truck. He wanted to avoid further confrontation, particularly with Reed. He was not carrying a penknife on his key ring in July 1988. Asked whether there was any period of which he had no memory, Dechaine replied, "I can safely say there are periods of time where my memory is probably not as sharp as it could have been, but I think that's because I was doing nothing of any significance to have to cause me to have reference points."

12

Dechaine had a reputation for peacefulness and non-violence. He was upset by violence and the sight of blood.

. . . .

After approximately nine hours of deliberation the jury returned a verdict of guilty as to all counts.

. . . .

**E.  Custody of Clippings**

Prior to the filing of Dechaine's motion for a new trial Connolly sought to remove certain of the defense exhibits in the Dechaine case. At a hearing held February 4, 1991[,] Connolly and prosecutor [Eric] Wright represented to the court that they had agreed that the exhibits in issue, which included some obtained by the state but offered by the defense, should be maintained in the custody of the court. The court thereafter issued an order "that the clerk of court shall not permit the removal of any exhibit in this case without further Order of the court" and that "insofar as any person wishes to examine any exhibit, such examination is to be done within the clerk's office and under the supervision of the clerk."

By form letter dated April 17, 1992[,] an assistant clerk of the court informed counsel for both Dechaine and the state that the exhibits would be disposed of in two weeks unless removed by counsel. By letter dated April 22, 1992[,] Connolly asked that the clerk not dispose of any evidence, offered to arrange for pickup if necessary and called the clerk's attention to the existence of the previous order in the matter. The court signed a form order dated April 30, 1992[,] authorizing the clerk to dispose of any exhibits not removed by counsel of record within thirty days. On May 5, 1992[,] Connolly removed defense exhibits 1-26, 26A and 27-46 from the clerk's office. By letter dated June 8, 1993[,] Connolly transmitted fingernail clippings that he stated were those of Cherry to a laboratory in Boston for DNA testing.

On December 13, 1993[,] the state filed a motion for return of property taken by Connolly, including the thumbnail clippings (exhibits 26 and 26A). A hearing was held at which Fernand LaRochelle, supervisor of the criminal division of the Attorney General's Office, testified that he became aware for the first time on December 9, 1993[,] that Connolly possessed the fingernail clippings. LaRochelle contacted Connolly, who declined to return the clippings, stating "that they were in a safe place and that if we executed a search warrant of his office that we would not find them because they were not there." At the conclusion of proceedings the court ordered the property at issue turned over to the state crime laboratory forthwith, with a proviso that the fingernail clippings could be destroyed only upon express written order of the court. Connolly that day returned certain exhibits, including the fingernail clippings. The order compelling return of the exhibits was upheld on appeal.

On May 24, 1994[,] CBR Laboratories, Inc. reported the results of tests on fingernail clippings that it had received from Connolly on June 10, 1993[,] and on blood labeled as that of Dechaine that it had received on April 22, 1994. The laboratory found that there were two or more donors to the DNA extracted from one of the fingernails and excluded Dechaine as a donor.

## F. State Post-Conviction Review Proceeding

Dechaine on September 29, 1995[,] filed a *pro se* state petition for post-conviction review. He alleged one ground of actual innocence and three grounds of ineffective assistance of counsel . . . .

The state on April 4, 1996[,] moved to depose Dechaine's co-counsel George Carlton, noting *inter alia* that (i) the State Petition had been languishing inasmuch as Dechaine had failed to respond to the court's inquiries concerning whether he had retained or required appointment of counsel, (ii) Carlton, whom the state represented was not present at trial when Dechaine testified, possessed knowledge disproving Dechaine's claim of innocence, (iii) although Dechaine had known the results of the CBR Laboratories DNA testing since May 1994, he had waited to file the State Petition until

September 15, 1995, two weeks after Carlton suffered a stroke, and (iv) Carlton was still capable of providing reliable information.

. . . .

The state on June 12, 1996[,] moved to dismiss the State Petition pursuant to 15 M.R.S.A. § 2128(5), which had been amended effective September 29, 1995 (the day of Dechaine's filing) to provide:

> A petition may be dismissed if it appears that by delay in its filing the State has been prejudiced in its ability to respond to the petition or to retry the petitioner, unless the petitioner shows that it is based on grounds of which the petitioner could not have had knowledge by the exercise of reasonable diligence before the circumstances prejudicial to the State occurred. If the delay is more than 5 years following the final disposition of any direct appeal to the Maine Law Court . . . prejudice is presumed, although this presumption is rebuttable by the petitioner.

. . . .

In support of its Motion To Dismiss, the state on December 19, 1996[,] filed five affidavits, three of which addressed Carlton's purported knowledge of Dechaine's guilt. These included an affidavit of LaRochelle averring *inter alia* that on the morning of July 8, 1988[,] he called Carlton and "told him that I had just two questions for him and he could answer or not. I asked Attorney Carlton if Sarah was still alive, and, if so, were we searching in the right area. Attorney Carlton replied that Sarah was not alive and added something to the effect that we were looking in the right area."

. . . .

By decision filed February 10, 1999[,] the court granted the Motion To Dismiss, holding that not only had Dechaine failed to rebut

the statutory presumption of prejudice pursuant to 15 M.R.S.A. § 2128(5) but that the state also had demonstrated actual prejudice. The court noted that following the state's "extensive but ultimately unsuccessful efforts to depose Carlton, which were continually opposed by the Petitioner[,]" Carlton had died on June 21, 1998. . . . The court [also] concluded, "The dismissal of the Dechaine PCR petition on procedural grounds will not result in a manifest injustice because the Petitioner cannot show that no reasonable juror would convict him even if he could get DNA test results of the victim's fingernail nail [sic] clippings into evidence."

. . . .

## II. Discussion

. . . .

The voluminous record in this case raises troubling questions. How could the professedly non-violent Dechaine have randomly abducted a twelve-year-old child and committed this atrocious crime? Dechaine denied under oath that he did it. No fingerprints, hairs or fibers matching those of Dechaine were found on or near the victim or at the Henkel home. Conversely, no fingerprints, hairs or fibers matching those of Cherry were found on Dechaine or in or on Dechaine's truck. Debris, including a pink synthetic fiber, was found near the crime scene that had no apparent connection to Dechaine or Cherry. The Maine State Police tracking dog did not pick up a track from one side of Dechaine's truck to the other[,] evidence that the state conceded was "a little ambiguous." Cherry had been warned not to let a stranger into the house, and there was no evidence of a struggle there. Dechaine's purported confessions contained no details of the crime. Dechaine was cooperative with police officers, allowing his person and his truck to be searched (although he admitted both that he hid his keys and at various points lied).

Nonetheless, the evidence of Dechaine's guilt remains substantial. Dechaine's papers were found in the Henkel driveway; a neighbor thought she saw a red Toyota pickup truck heading north (in the direction in which the body later was found) shortly after the last

known contact with Cherry; Dechaine's truck was found near the body; Dechaine himself emerged from the woods in the general vicinity of the body; a rope from Dechaine's truck was found in between the truck and the body; the rope used to bind Cherry's hands was consistent with that in Dechaine's truck and that found in the woods; the dog evidence indicated that someone headed from the passenger side of Dechaine's truck toward the spot where the body was found; Nancy Emmons was surprised that the penknife was not on her husband's key ring; and four police or corrections officers testified that Dechaine made incriminating statements on three separate occasions within the space of several hours on July 8, 1988[,] the pivotal day on which the body was found and Dechaine was placed under arrest. Finally, three attorneys aver that Carlton indicated to them that Dechaine was guilty; most chillingly, that Carlton conveyed to LaRochelle of the Attorney General's Office on the morning of July 8, 1988[,] before Cherry's body was found that Cherry was no longer alive and that searchers were looking in the right place.

. . . .

Against this backdrop, Dechaine now offers the May 1994 DNA evidence that two people contributed DNA to the Cherry thumbnail clippings, neither of which was him. This evidence, standing alone, simply does not suffice to place this now twelve-year-old case "within the narrow class of cases . . . implicating a fundamental miscarriage of justice."

As an initial matter, as the state points out, the manner in which the nail clippings were handled raises concerns about chain of custody and possible contamination. Even assuming *arguendo* that there were no such problem, the presence of a DNA profile inconsistent with those of either Cherry or Dechaine does not in itself undermine the weight of the evidence against Dechaine. There is no evidence that the mystery DNA necessarily or even likely transferred to the nail clippings during commission of the crime. Indeed, the only evidence of record touching on the subject remains that of Brinkman and Roy to the effect that the blood of the assailant would not have been expected to be found on Cherry's nails.

Even with the benefit of the DNA evidence and the excluded Senecal[2] evidence, a reasonable juror could have found Dechaine guilty beyond a reasonable doubt.

*Dechaine*, 2000 U.S. Dist. LEXIS 12289 at *3-24, *27, *37-48, *60-64 (citations omitted).

[¶4] The instant case began in 2003 when Dechaine filed a motion for a new trial pursuant to Maine's original DNA analysis statute. *See* 15 M.R.S. §§ 2136-2138 (2005). Following DNA testing, the court limited the scope of the evidence that Dechaine would be allowed to present at a hearing on the motion to any new DNA evidence, excluding proffered evidence related to Dechaine's admissions and the time of the victim's death. On the day that the hearing was to take place, Dechaine withdrew his motion on the ground that he could not meet his burden under the then-existing statute.

[¶5] The Legislature made substantial changes to the statute in 2006. P.L. 2005, ch. 659, §§ 1-6 (effective Sept. 1, 2006) (codified at 15 M.R.S. §§ 2136-2138 (2014)). In 2008 Dechaine again moved for a new trial, this time

---

2 Dechaine had identified Douglas Senecal as an alternative suspect.

pursuant to the amended statute.[3] The court ordered additional DNA testing and

analysis on several items pursuant to an agreement reached by the parties.

---

[3] In its present form the statute provides, in part:

**§ 2138. Motion; process**

**1. Filing motion.** A person authorized in section 2137 who chooses to move for DNA analysis shall file the motion in the underlying criminal proceeding. The motion must be assigned to the trial judge or justice who imposed the sentence unless that judge or justice is unavailable, in which case the appropriate chief judge or chief justice shall assign the motion to another judge or justice. Filing and service must be made in accordance with Rule 49 of the Maine Rules of Criminal Procedure.

. . . .

**4-A. Standard for ordering DNA analysis.** The court shall order DNA analysis if a person authorized under section 2137 presents prima facie evidence that:

**A.** A sample of the evidence is available for DNA analysis;

**B.** The evidence to be tested has been subject to a chain of custody sufficient to establish that the evidence has not been substituted, tampered with, replaced or altered in a material way;

**C.** The evidence was not previously subjected to DNA analysis or, if previously analyzed, will be subject to DNA analysis technology that was not available when the person was convicted;

**D.** The identity of the person as the perpetrator of the crime that resulted in the conviction was at issue during the person's trial; and

**E.** The evidence sought to be analyzed, or the additional information that the new technology is capable of providing regarding evidence sought to be reanalyzed, is material to the issue of whether the person is the perpetrator of, or accomplice to, the crime that resulted in the conviction.

. . . .

**8. Results.** The crime lab shall provide the results of the DNA analysis under this chapter to the court, the person authorized in section 2137 and the attorney for the State. Upon motion by the person or the attorney for the State, the court may order that copies of the analysis protocols, laboratory procedures, laboratory notes and other relevant records compiled by the crime lab be provided to the court and to all parties.

**A.** If the results of the DNA analysis are inconclusive or show that the person is the source of the evidence, the court shall deny any motion for a new trial. If the DNA analysis results show that the person is the source of the evidence, the defendant's DNA record must be added to the state DNA data base and state DNA data bank.

**B.** If the results of the DNA analysis show that the person is not the source of the evidence and the person does not have counsel, the court shall appoint counsel if the court finds that the person is indigent. The court shall then hold a hearing pursuant to subsection 10.

. . . .

   **10.   Standard for granting new trial; court's findings; new trial granted or denied.**   If the results of the DNA testing under this section show that the person is not the source of the evidence, the person authorized in section 2137 must show by clear and convincing evidence that:

**A.** Only the perpetrator of the crime or crimes for which the person was convicted could be the source of the evidence, and that the DNA test results, when considered with all the other evidence in the case, old and new, admitted in the hearing conducted under this section on behalf of the person show that the person is actually innocent. If the court finds that the person authorized in section 2137 has met the evidentiary burden of this paragraph, the court shall grant a new trial;

**B.** Only the perpetrator of the crime or crimes for which the person was convicted could be the source of the evidence, and that the DNA test results, when considered with all the other evidence in the case, old and new, admitted in the hearing conducted under this section on behalf of the person would make it probable that a different verdict would result upon a new trial; or

**C.** All of the prerequisites for obtaining a new trial based on newly discovered evidence are met as follows:

   **(1)** The DNA test results, when considered with all the other evidence in the case, old and new, admitted in the hearing conducted under this section on behalf of the person would make it probable that a different verdict would result upon a new trial;

   **(2)** The proffered DNA test results have been discovered by the person since the trial;

   **(3)** The proffered DNA test results could not have been obtained by the person prior to trial by the exercise of due diligence;

   **(4)** The DNA test results and other evidence admitted at the hearing conducted under this section on behalf of the person are material to the issue as to who is responsible for the crime for which the person was convicted; and

20

[¶6]   Two years later, Dechaine moved to allow evidence at the pending hearing concerning (1) the time of the victim's death, (2) "any alternative suspect," (3) "any so-called confession or admissions," and (4) "[a]ll other evidence which is exculpatory."   As authority for his request, Dechaine relied upon the amended statute and the Due Process Clauses of the United States and Maine Constitutions. The State objected, contending that the court was already required by statute to consider "all the other evidence in the case, old and new," and that the statutory definition of that phrase, which included the evidence admitted at trial and prior proceedings, limited the admissible evidence to evidence concerning the new DNA testing and analysis.   *See* 15 M.R.S. § 2138(10).   Construing and quoting section 2138(10), the court found that "[i]t is . . . clear that 'new' evidence may be admitted only if it is 'relevant to the DNA testing and analysis conducted on the

**(5)** The DNA test results and other evidence admitted at the hearing conducted under this section on behalf of the person are not merely cumulative or impeaching, unless it is clear that such impeachment would have resulted in a different verdict.

The court shall state its findings of fact on the record or make written findings of fact supporting its decision to grant or deny the person authorized in section 2137 a new trial under this section.  If the court finds that the person authorized in section 2137 has met the evidentiary burden of paragraph A, the court shall grant a new trial.

For purposes of this subsection, "all the other evidence in the case, old and new," means the evidence admitted at trial; evidence admitted in any hearing on a motion for new trial pursuant to Rule 33 of the Maine Rules of Criminal Procedure; evidence admitted at any collateral proceeding, state or federal; evidence admitted at the hearing conducted under this section relevant to the DNA testing and analysis conducted on the sample; and evidence relevant to the identity of the source of the DNA sample.

15 M.R.S. § 2138 (2014).

sample' or 'relevant to the identity of the source of the DNA sample.'" The court granted Dechaine's motion "to the extent that the DNA evidence and analysis actually implicates [an] alternative suspect," and otherwise denied the motion.

[¶7] In July 2011, Dechaine filed a motion asking the court to recuse and a motion to present a claim of actual innocence. The State objected, arguing that (1) the statute did not contemplate relitigating trial issues apart from issues generated by the new DNA analysis; and (2) if a "freestanding" claim of actual innocence is cognizable in Maine, it must be resolved in the statutory post-conviction review process. *See* 15 M.R.S. §§ 2121-2132 (2014). The court ruled that "[t]o establish actual innocence under [15 M.R.S.] [s]ection 2138(10)(A), the defendant may introduce 'all the other evidence in the case, old and new.'" It denied the motion insofar as it sought to present a claim of actual innocence independent of the statute.

[¶8] The motion for new trial went to hearing on June 12-14, 2012. At the conclusion of the hearing, Dechaine requested additional DNA testing, utilizing a different sample-collection technique, on the victim's t-shirt and bra, a bandana that had been used as a gag, and a scarf that had been used as a ligature around her neck. The court granted the request and recessed the hearing. After the DNA testing laboratory filed five additional reports concerning those items, the hearing resumed on November 7, 2013, and concluded the following day.

[¶9] On April 9, 2014, the court denied Dechaine's motion for a new trial in a twenty-seven-page decision, finding that Dechaine had not met the burden imposed on him by 15 M.R.S. § 2138(10)(C) to show by clear and convincing evidence that a new trial would probably result in a different verdict. *See* 15 M.R.S. § 2138(10)(C)(1) (requiring the defendant to establish, by clear and convincing evidence, that "[t]he DNA test results, when considered with all the other evidence in the case, old and new, admitted in the hearing . . . would make it probable that a different verdict would result upon a new trial"). By separate order, the court also denied Dechaine's motion to recuse.

[¶10] The court based its ultimate conclusion on its findings that (1) none of the new DNA evidence implicated Douglas Senecal, whom Dechaine had advanced as an alternative suspect since the beginning of the case; (2) there was no evidence that unidentified male DNA found on one-half of the victim's left thumbnail (discussed in detail *infra*), which did not come from Dechaine, was connected to her murder; (3) concerning the left thumbnail DNA, the testimony of Catherine MacMillan, a Maine State Police Crime Laboratory forensic DNA analyst, and that of two additional experts in DNA analysis, was "credible and persuasive" when those witnesses opined that contamination of the sample in the circumstances of this case was likely; (4) contamination of the left thumbnail sample was further suggested by the fact that the DNA on the nail did not match

male DNA found on other items closely related to the crime that were the subject of the November 2013 hearing; and (5) "as several other courts have found, the evidence of Dechaine's guilt is substantial."

[¶11]  This appeal followed.

## II.  DISCUSSION

A.    Motion For New Trial

[¶12]    Dechaine contends that he is entitled to a new trial pursuant to 15 M.R.S. § 2138(10)(C), which provides:

If the results of the DNA testing under this section show that the person is not the source of the evidence, the person authorized in section 2137 must show by clear and convincing evidence that:

. . . .

**C.**  All of the prerequisites for obtaining a new trial based on newly discovered evidence are met as follows:

**(1)**  The DNA test results, when considered with all the other evidence in the case, old and new, admitted in the hearing conducted under this section on behalf of the person would make it probable that a different verdict would result upon a new trial;

**(2)**  The proffered DNA test results have been discovered by the person since the trial;

**(3)**  The proffered DNA test results could not have been obtained by the person prior to trial by the exercise of due diligence;

**(4)**  The DNA test results and other evidence admitted at the hearing conducted under this section on behalf of the person are

24

material to the issue as to who is responsible for the crime for which the person was convicted; and

**(5)** The DNA test results and other evidence admitted at the hearing conducted under this section on behalf of the person are not merely cumulative or impeaching, unless it is clear that such impeachment would have resulted in a different verdict.

. . . .

For purposes of this subsection, "all the other evidence in the case, old and new," means the evidence admitted at trial; evidence admitted in any hearing on a motion for new trial pursuant to Rule 33 of the Maine Rules of Criminal Procedure; evidence admitted at any collateral proceeding, state or federal; evidence admitted at the hearing conducted under this section relevant to the DNA testing and analysis conducted on the sample; and evidence relevant to the identity of the source of the DNA sample.

15 M.R.S. § 2138(10).

[¶13] We recently stated the standard of review:

We review a court's factual findings on a motion for a new trial for clear error. We review the court's interpretation of the post-conviction DNA analysis statute de novo. When a court has reached findings that are supported by the record and has interpreted and applied the statute properly, the court's ultimate decision whether to grant a new trial is reviewed for an abuse of discretion.

*State v. Reese*, 2013 ME 10, ¶ 22, 60 A.3d 1277 (citations omitted). Additionally, "[w]hen reviewing on appeal findings of fact that must be proved by clear and convincing evidence, we determine whether the factfinder could reasonably have been persuaded that the required factual finding was or was not proved to be highly

probable." *Bailey v. Bd. of Bar Examiners*, 2014 ME 58, ¶ 17, 90 A.3d 1137 (quotation marks omitted).

[¶14] What follows is a discussion of the evidence admitted during the two parts of the hearing on Dechaine's motion for a new trial, and the application of the requirements of section 2138(10)(C) to that evidence given the burden of proof specified by the statute.

### 1. Left Thumbnail DNA

[¶15] During the three days of hearing in June 2012, the primary piece of evidence at issue was the DNA mixture that included male DNA found on one-half of Sarah Cherry's left thumbnail. As discussed *infra*, experts testified that Dechaine was excluded as its source, as was Douglas Senecal and other potential alternative suspects. The contributor of the DNA remains unknown, and, according to Catherine MacMillan, because the DNA was degraded and did not yield a full profile, DNA alone can never positively identify that person. Dechaine contends that the presence of another male's DNA on the victim's thumbnail makes it probable that a new jury would acquit him. The State argues that a new trial would not yield a different result for several reasons, chief among them being the likelihood that the male DNA resulted from contamination of the nail sample and is therefore not evidence that is relevant to the question of who committed the crime.

26

[¶16] The trial court's thorough decision amply supports its ultimate conclusion that "the defendant has failed to connect the DNA under Sarah's fingernails to her murderer." Relevant to the thumbnail DNA, the decision discussed the chain of custody, the results of the DNA testing, and the possibility of contamination.

(a) The Chain of Custody

[¶17] In July 1988 the victim's thumbnails went from the autopsy room to the State Crime Lab for blood typing, but not DNA testing. From there they went to the jury room at the trial; an exhibit room at the Knox County Superior Court Clerk's Office following the trial; a file in Attorney Thomas Connolly's office when they were released to him by the clerk's office; CBR Labs via FedEx in 1993 when Connolly sent them there for DNA testing; back to Connolly's office via FedEx; back to the State pursuant to a court order some nineteen months after Connolly took possession of them; and finally back to the State Crime Laboratory for DNA testing in March 2003, almost fifteen years after they were collected at the autopsy.

(b) Results of the DNA Testing

[¶18] CBR Labs and the State Crime Laboratory made the same finding— half of the left thumbnail tested by CBR showed the presence of a degraded DNA mixture that included male DNA, and it yielded a partial profile from which

Dechaine was excluded. The remaining half, as well as the right thumbnail, revealed no male DNA. Catherine MacMillan testified that she was only able to exclude Dechaine as a contributor to the mixture by significantly lowering the laboratory's normal testing threshold. She further testified that she could not identify what biological material was the source of the DNA (nor could any of the experts), or say how it came to be on the nail, when it was placed there, or whose it was. The experts who testified at the hearing disagreed as to whether it was possible to say that the male DNA in the mixture came from only one male.

(c) Possibility of Contamination

[¶19] The court heard testimony from Robert Goodrich, a veteran forensic medical technician with the Chief Medical Examiner's Office who assisted at the Cherry autopsy, which was performed in the local hospital morgue. Goodrich described conditions at the autopsy that, from a DNA collection perspective, can only be described as primitive. The court could easily conclude that at the time the fingernail clippings were originally taken they were potentially exposed to DNA unrelated to the crime coming from other bodies that the nail clippers had been used on; the tool chest that they were stored in; the bloody, "grungy" towels that the clippers were laid on in the chest; or the examiners themselves, who wore no masks and only sometimes wore gloves. It was explained by a state trooper who

worked for the crime lab in the mid-1980s, and by Attorney Connolly, that blood evidence, not DNA, was the focus of sample collection at that time.

[¶20]    MacMillan testified that the conditions described by Goodrich suggested "a very highly contaminated toolbox."   She said that she would be concerned about contamination of samples obtained under those circumstances because when utilizing modern polymerase chain reaction (PCR) DNA analysis, in which a very small amount of genetic material is replicated millions of times in order to produce a sample for analysis, even the act of speaking over a sample could contaminate it and affect the result.   She agreed that if a sample were contaminated with DNA not related to the crime, then the PCR process would replicate the irrelevant DNA millions of times.   MacMillan said that despite the techniques the State Crime Laboratory now utilizes—single-use instruments and pipette tips, sterile scalpels, gloves, bleach for the analysts' gloves and hands, and an autoclave to sterilize tubes—cross-contamination has occurred.

[¶21]    Other experts who testified at the hearing, including Dr. Frederick Bieber, a member of the Harvard Medical School faculty and a geneticist at Brigham and Women's Hospital, and Dr. Carll Ladd, the supervisor of the DNA section at the Connecticut Forensic Laboratory, agreed with MacMillan's concern regarding the possibility of contamination.   The court explicitly found the testimony of MacMillan, Bieber, and Ladd concerning the probability of

contamination to be "credible and persuasive." Dr. Ladd went so far as to say, in discussing the collection of the victim's fingernails at the autopsy, "I can't imagine anybody in forensic DNA testing attempting to defend that procedure by today's standards."

2.    Other New DNA Evidence

[¶22]  During the two days of hearing in November 2013, the focus was on several items that had been sent for a new round of DNA testing using a scraping, as opposed to swabbing, collection technique.  Specifically, testing was performed on the victim's t-shirt and bra, a bandana that was found in her mouth, and a scarf that was used as a ligature around her neck.  The testing generated five additional reports from Orchid Cellmark Labs, dated

- 8/31/12: the initial supplemental report;

- 9/28/12: generated after Orchid Cellmark received a blood sample from Dechaine;

- 10/12/12: generated after William Moore, a private investigator and the son of James Moore (author of a book about the Dechaine case), traveled to Florida and obtained at a restaurant a coffee cup, napkin, and fork purportedly used by Douglas Senecal, whom Dechaine had previously advanced as an alternative suspect;

- 12/28/12: generated using a different form of testing—instead of Y-STR testing, which analyzes only male Y-chromosome DNA, this report resulted from standard STR testing utilizing an additional amplification method; and

- 7/19/13: generated using STR testing with a second amplification method.

[¶23] Dr. Rick Staub, the expert called by Dechaine who represented Orchid

Cellmark at the hearing, testified that the DNA analyzed in the reports

> was of low quantity and could be subject to what we call stochastic effects and is sometimes difficult to interpret. . . . In plain English that means . . . when you get to a [] low enough level, it doesn't always amplify and give you everything that's there. . . . [I]t can cause the interpretation to be confusing. . . . [I]f a laboratory is careful in their analysis . . . it would be accurate. But you have to be very careful when you analyze. . . . It can lead to inconclusive results . . . .
>
> . . . .
>
> I think in general the samples were fairly low level. Some were higher than others, but pretty low levels. . . . Particularly the male DNA in the samples. . . . Because the samples were a mixture of male and female DNA.

[¶24] In summary form, the additional testing yielded the following results:

- T-shirt: Y-STR testing revealed a mixture containing at least two males from which Dechaine could not be excluded and from which the coffee cup DNA (presumably Senecal's) could be excluded. Dr. Staub calculated the inclusion probability for Caucasian males as 11 in 4114, that is, 1 Caucasian male of 374 could be a contributor to the mixture. He agreed that that statistic becomes meaningful if an identified male who could be a contributor was at or near the scene of the crime.

- Scarf: In Y-STR testing of two samples taken from the scarf, one yielded a mixture of at least two males and the other was unclear. Dechaine could not be excluded from the profile obtained, nor could the coffee cup donor. Staub calculated the inclusion probability for Dechaine as 115 in 4114, or roughly 1 in 35; the probability for the coffee cup donor was 96 in 4114

[roughly 1 in 43]. In STR testing (the last two reports), no conclusion could be reached regarding Dechaine.

- Bra: The bra yielded a male DNA profile; analysis was inconclusive as to whether Dechaine could be a contributor. However, Staub testified that it appeared to be the same male who was a contributor on the t-shirt, scarf, and bra, and so he agreed that of the people that Orchid Cellmark tested, only Dechaine fit the criteria. The coffee cup donor, who was excluded from the t-shirt, did not fit the criteria.

- Bandana: The bandana yielded no male DNA.

- Left Thumbnail: Although the thumbnail DNA was not specifically the subject of the Orchid Cellmark reports, Staub testified that both Dechaine and the coffee cup donor were excluded as its source.

[¶25]  Prior to the new round of testing, Dr. Staub had a working hypothesis that if DNA on the items closely associated with the victim also matched the left thumbnail DNA, then that finding would work against the possibility that the thumbnail DNA resulted from contamination. He agreed that the test results refuted that hypothesis.

[¶26]  Dr. Greg Hampikian, a professor of biology and criminal justice at Boise State University and the director of the Idaho Innocence Project, who was called by Dechaine and who testified at both the June 2012 and November 2013 hearings, took no issue with Staub's analysis, although he stood by his earlier opinion that the half of the left thumbnail on which there was no male DNA served as a control for the half on which there was—in Hampikian's view, if there was

32

contamination then it would be seen on both parts of the nail. Hampikian agreed that (1) the coffee cup donor was excluded from the nail sample, (2) Dechaine could not be excluded from the t-shirt and scarf, and (3) "the nails don't fit all the other evidence."

[¶27] Dr. Ladd, who was called by the State and who also testified in both parts of the hearing, repeated his earlier conclusion that "based on the way the clippers were stored and handled [] I would say that is textbook conditions for contamination." He disagreed with Hampikian that the second half of the thumbnail served as a control; in Ladd's view it was not a known quantity as a standard control would be, but rather "simply [] another evidentiary sample." He said that the second half of the nail might have DNA on it at such a low level as to be non-reproducible, and that "when you're talking about low level contaminants, you can't assume that they are evenly spread out."

[¶28] Ladd also testified that when a laboratory engages in "low copy number PCR" or "enhanced interrogation methods," as in this case, the testing process becomes "considerably more sensitive than traditional STR testing," with the result that "you've increased the chance of contamination being a factor in the results." Ladd said that ultimately

> there then becomes a question as to whether you can determine if the
> reported results are reflective of the evidence at the time of the
> incident and so to what degree are they scientifically relevant. . . .

[T]he disagreement is not whether somebody is included or excluded, it's whether they are relevant to the incident.

. . . .

With these types of enhanced interrogation procedures, and given that the proper safeguards for mitigating contamination were definitely not employed in this case and are not employed back in the '80s anywhere in the United States, it is difficult to answer [whether the DNA results from the five new reports were the product of contamination or are otherwise meaningful]. . . . Is that the way the evidence was at the time of the incident? I don't believe it's possible to conclusively make that determination.

[¶29] Ladd also took issue with using the coffee cup DNA as "[a] pseudo known [] used to represent the profile of a particular individual." He said that another person's DNA can be on an item that is collected, or the collector can simply make a mistake. Finally, he noted that the Cellmark reports indicated apparent contamination at the laboratory itself, which he said was "not really surprising" given the "particularly sensitive procedures" being used.

3. Application of the Burden of Proof to These Facts

[¶30] Pursuant to section 2138(10)(C), Dechaine had the burden to establish by clear and convincing evidence all five of its enumerated elements. The court found that he failed to prove two, namely that "[t]he DNA test results, when considered with all the other evidence in the case, old and new . . . would make it probable that a different verdict would result upon a new trial," and that "[t]he DNA test results and other evidence admitted at the hearing . . . are material to the

issue as to who is responsible for the crime for which the person was convicted."

15 M.R.S. § 2138(10)(C)(1), (4).

[¶31] When, as here, the court determines that the perpetrator is not the only possible source of the DNA at issue, we consider two questions:

> (1) whether the court erred in determining that the DNA could have come from a source other than the perpetrator of the crime, and (2) if the court's finding that the DNA could have come from another source is supported by competent evidence in the record, whether the court erred or abused its discretion in denying the motion for a new trial pursuant to 15 M.R.S. § 2138(10)(C).

*Reese*, 2013 ME 10, ¶ 24, 60 A.3d 1277 (citation omitted).

[¶32] Here, the court did not clearly err in finding that the left thumbnail DNA could have come from a source other than the perpetrator. As discussed, there was ample expert testimony, found to be "credible and persuasive" by the court, that the DNA could have resulted from contamination at the autopsy or later, during the left thumbnail's fifteen-year odyssey from the autopsy room to the State Crime Laboratory. Furthermore, the court was justified in finding that there was no evidence that Sarah Cherry had struggled with her killer, meaning that it was entirely possible that the small amount of unidentified male DNA on her thumbnail was left there before her death by a person and in a manner altogether unrelated to her murder. In sum, "the court's finding that [] contamination was *possible* is not clearly erroneous." *Reese*, 2013 ME 10, ¶ 26, 60 A.3d 1277.

[¶33] Turning to the court's determination that a new trial would probably not result in a different verdict, the second round of testing that was the subject of the November 2013 hearing does not help Dechaine's cause, in that it was, to the limited extent that inclusion ratios are useful, inculpatory and not exculpatory. The experts all testified that only Dechaine, of the identified males compared, could not be excluded as a sole contributor of the male DNA found on the t-shirt, bra, and scarf.

[¶34] Concerning the left thumbnail DNA that was the subject of the June 2012 hearing, the record supports the court's findings that (1) there is no evidence that the DNA is connected to the crime at all, although there is abundant evidentiary support for a contrary conclusion that the DNA likely resulted from contamination as opposed to being left by the murderer; that support included the fact that none of the profiles generated from items known to be intimately connected to the crime in the second round of testing matched the thumbnail DNA;[4] (2) it identifies no one; and (3) it excludes Douglas Senecal, the man that Dechaine previously identified as an alternative suspect.

---

[4] In *Reese*, we took note of

the conundrum that may be faced by lab analysts, judges, attorneys, and juries when evidence that was collected and stored pursuant to now-outdated protocols is subjected to more advanced modes of DNA testing. Although the advances in DNA testing may provide more information about the DNA present in old samples, the new DNA evidence will not necessarily be illuminating on issues related to defendants' guilt or innocence if

[¶35]  Finally, the court recognized the substantial evidence of Dechaine's guilt, as we did twenty-five years ago.  *See Dechaine*, 572 A.2d at 132 n.3. Nothing produced in the most recent five-day hearing changes that analysis and "make[s] it probable that a different verdict would result upon a new trial." 15 M.R.S. § 2138(10)(C)(1).  It is likely that a jury examining the new, arguably inculpatory DNA evidence, along with "all the other evidence in the case, old and new," would reach the same verdict as did the original jury.  *See id.*  Accordingly, Dechaine failed to prove the elements of section 2138(10)(C) by clear and convincing evidence, and the court's denial of his motion for a new trial was not erroneous or an abuse of its discretion.  *See Reese*, 2013 ME 10, ¶¶ 24, 32, 60 A.3d 1277.

B.    Actual Innocence Claim

[¶36]  Dechaine contends that it was "constitutionally impermissible and manifestly unjust" to deny him the opportunity to present evidence at the DNA analysis hearing concerning (1) the time of the victim's death, (2) alternative suspects, and (3) his "so-called confessions"; that is, to present a claim of actual innocence based in part on evidence not connected to the new DNA analysis.  The court, finding that "Maine has never recognized a freestanding claim of actual

---

the samples were not handled and preserved using the more rigorous lab practices that are in place today.

*State v. Reese*, 2013 ME 10, ¶ 27 n.6, 60 A.3d 1277.  That caution is applicable in this case.

innocence as grounds for post-conviction relief," denied Dechaine's request "to present [a] claim of actual innocence independent of the statutory mechanism set forth in 15 M.R.S. § 2138(10)(A)." It allowed him "to introduce evidence relating to an alternative suspect . . . to the extent that the DNA evidence and analysis actually implicates the alternative suspect."

[¶37]  The court's interpretation of section 2138 was correct because Maine's post-conviction review process "provides a comprehensive and, except for direct appeals from a criminal judgment, exclusive method of review of those criminal judgments and of post-sentencing proceedings occurring during the course of sentences." 15 M.R.S. § 2122. The DNA analysis statute affords a defendant a narrow opportunity to prove actual innocence or otherwise obtain a new trial outside of the post-conviction review process.[5]  It is, however, limited in scope by its own terms.

[¶38]  Section 2138(10) provides that the "other evidence in the case, old and new" that the court is to consider

> means the evidence admitted at trial; evidence admitted in any hearing
> on a motion for new trial pursuant to Rule 33 of the Maine Rules of

---

[5]  The statute allows a defendant to prove, by clear and convincing evidence, that

> [o]nly the perpetrator of the crime or crimes for which the person was convicted could be
> the source of the evidence, and that the DNA test results, when considered with all the
> other evidence in the case, old and new, admitted in the hearing . . . show that the person
> is actually innocent.

15 M.R.S. § 2138(10)(A) (2014).  The court explicitly allowed Dechaine to pursue that opportunity.

> Criminal Procedure; evidence admitted at any collateral proceeding, state or federal; evidence admitted at the hearing conducted under this section relevant to the DNA testing and analysis conducted on the sample; and evidence relevant to the identity of the source of the DNA sample.

In other words, evidence admitted at the trial or in any prior collateral proceeding concerning, inter alia, the time of the victim's death, alternative suspects, or the defendant's confessions must be considered by the court in deciding a motion for a new trial based on new DNA analysis.

[¶39] The "hearing conducted under [section 2138]," on the other hand, allows the court to consider only two kinds of *new* evidence—that "relevant to the DNA testing and analysis conducted on the sample," and that "relevant to the identity of the source of the DNA sample." 15 M.R.S. § 2138(10)(C). The statute says nothing about reopening or supplementing the evidence introduced in prior proceedings; rather, it allows the admission of DNA-related evidence that could not have been known at those prior proceedings, namely the new DNA results and their impact on identifying the perpetrator. Accordingly, the trial court did not err in construing the statute to bar a "freestanding" claim of actual innocence. *See Reese*, 2013 ME 10, ¶ 22, 60 A.3d 1277 (stating that the trial court's interpretation of the post-conviction DNA analysis statute is reviewed de novo).

[¶40] Dechaine's assertion that the Due Process Clauses of the United States and Maine Constitutions compel the admission of the evidence that he seeks

to introduce is not persuasive. We have previously noted six safeguards, in addition to a direct appeal, that exist in Maine law to ensure that a defendant receives post-conviction due process, including the statute at issue here. *State v. Blakesley*, 2010 ME 19, ¶ 13, 989 A.2d 746.

[¶41] Furthermore, in discussing the due process required in a post-conviction context, the United States Supreme Court said that

> [a] criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man.
>
> . . . .
>
> The State accordingly has more flexibility in deciding what procedures are needed in the context of postconviction relief. When a State chooses to offer help to those seeking relief from convictions, due process does not dictate the exact form such assistance must assume.
>
> . . . .
>
> [T]he question is whether consideration of [a defendant's] claim within the framework of the State's procedures for postconviction relief offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, or transgresses any recognized principle of fundamental fairness in operation.
>
> . . . .
>
> [I]t is [the defendant's] burden to demonstrate the inadequacy of the state-law procedures available to him in state postconviction relief.
>
> . . . .

> [Here, the defendant] obliquely relies on an asserted federal constitutional right to be released upon proof of "actual innocence." Whether such a federal right exists is an open question. We have struggled with it over the years . . . . [The defendant] does not dispute that a federal actual innocence claim . . . would be brought in habeas.

*Dist. Attorney's Office v. Osborne*, 557 U.S. 52, 68-69, 71-72 (2009) (citations and quotation marks omitted).

[¶42]  Dechaine has not met his burden of demonstrating the alleged inadequacy of Maine's post-conviction relief procedures; indeed, the fact that he has been afforded the opportunity to pursue his post-trial claims in several proceedings demonstrates the opposite.  The Maine Constitution affords him no greater protection than the Fourteenth Amendment rights discussed in *Osborne*. *Doe I v. Williams*, 2013 ME 24, ¶ 61, 61 A.3d 718.

C.    Motion to Recuse

[¶43]  Dechaine finally contends that the justice who presided at his trial was required to recuse because various rulings that he made over the twenty-seven-year history of this case equated to a predisposition against him, and so "[g]iven the lengthy and remarkable history of this case and repeated assertions of innocence by [Dechaine] . . . the DNA Motion for a New Trial should have been presided over by an objective Justice with no question of bias or prejudice or earlier involvement in the case."

[¶44] As Dechaine recognizes, the DNA analysis statute requires that "[t]he motion must be assigned to the trial judge or justice who imposed the sentence unless that judge or justice is unavailable." 15 M.R.S. § 2138(1). The Justice's decision not to recuse is reviewed for an abuse of discretion. *In re J.R. Jr.*, 2013 ME 58, ¶ 16, 69 A.3d 406. We have said that "[g]enerally, knowledge gained in a prior proceeding is not a sufficient ground to recuse a judge in a subsequent matter," and that "[a] judge is as much obliged not to recuse himself when it is not called for as he is obliged to when it is." *Id.* ¶¶ 17-18 (quotation marks omitted).

[¶45] Here, Justice Bradford considered the appropriate canons of judicial conduct and relevant decisions of this Court, noted that Dechaine does not allege "any personal bias or prejudice," and observed that we found no fault with his trial rulings on direct appeal. *See Dechaine*, 572 A.2d at 132-36. Particularly where the statute directed that the sentencing justice preside at Dechaine's hearing, the record reveals no abuse of discretion.

The entry is:

Judgment affirmed.

**On the briefs:**

Steven C. Peterson, Esq., West Rockport, for appellant Dennis J. Dechaine

Janet T. Mills, Attorney General, and Donald W. Macomber, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State of Maine

**At oral argument:**

Steven C. Peterson, Esq., for appellant Dennis J. Dechaine

Donald W. Macomber, Asst. Atty. Gen., for appellee State of Maine

Knox Superior Court docket number CR-1989-71
FOR CLERK REFERENCE ONLY