2003 ME 67

**STATE of Maine**

v.

**Foster BATES.**

Supreme Judicial Court of Maine.

Argued: March 12, 2003.

Decided: May 8, 2003.

G. Steven Rowe, Attorney General, Donald W. Macomber, Asst. Attorney General (orally), Fernand R. LaRochelle, Asst. Attorney General, Augusta, for State.

Jane Elizabeth Lee (orally), Portland, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, CALKINS, and LEVY, JJ.

CALKINS, J.

[¶ 1] Foster Bates appeals from a judgment of conviction for murder, 17–A M.R.S.A. § 201 (1983 & Supp.2002), and gross sexual assault (Class A), *id.* § 253 (Supp.2002), entered in the Superior Court (Cumberland County, *Crowley, J.*) after a jury trial.[1] Bates contends that the court erred in jury selection by allowing persons who had read a newspaper article about the murder to sit on the jury. He also

---

1. Both of these statutes were later amended. *See* 17–A M.R.S.A. § 201 (Supp.2002) (effective Jan. 31, 2003); *id.* § 253 (Supp.2002) (effective Jan. 31, 2003).

challenges the admission of testimony from his ex-wife concerning his conduct on the evening of the murder, and he argues that the evidence was insufficient to support his convictions. Bates further appeals from his sentence of life imprisonment. We affirm both the convictions and the sentence.

## I. FACTS AND PROCEDURE

[¶ 2] The following facts were in evidence at Bates's trial. Tammy Dickson was last seen alive early in the evening of Thursday, February 17, 1994. She lived in an apartment complex and routinely had morning coffee with neighbors, but she did not appear on Friday. When her neighbors had not seen her by Saturday, one of them tried to contact William Quinn, with whom Dickson had an on-again/off-again relationship. The neighbor finally reached Quinn on Sunday and asked Quinn to check on Dickson. Quinn had a key to Dickson's apartment, and Sunday evening he went there and discovered Dickson's body.

[¶ 3] The police were notified, and when they arrived they removed a blanket covering Dickson and saw that her hands were bound behind her, a pillowcase and items of clothing covered her face, and she was naked from the waist down. Items from Dickson's apartment were taken to the crime laboratory for further examination, and some samples were sent to the FBI lab. The medical examiner concluded that the cause of death was strangulation and that Dickson had been dead for several days before her body was discovered. At the post-mortem examination, the medical examiner found a green sock in Dickson's mouth and bruising on Dickson's body, including abrasions on her arms, elbows, and knees that were consistent with rug burns.

[¶ 4] The police interviewed numerous people including Quinn and Bates. Bates and his wife were neighbors of Dickson, and Bates told police that he had been at a basketball game on Thursday night. He denied having any relationship with Dickson other than that Dickson had sometimes babysat for Bates's child. The police obtained blood samples from Quinn and Bates.

[¶ 5] Two years later, the results of the DNA analysis by the FBI lab became available, showing that Quinn's semen was on a robe found near Dickson's body. The vaginal swabs that had been taken from Dickson were not conclusive. The police questioned Quinn extensively, and Quinn disclosed that there had been a green sock in Dickson's mouth when he discovered her body. This was information that the police had not given to the public. Quinn admitted that he could have gone to Dickson's apartment on the night of the murder and had sex with her. He acknowledged that he had been drinking heavily at the time.

[¶ 6] Several years later further DNA tests with newer technology were done on the swab of Dickson's vagina, and these tests matched the sperm cells on the vaginal swab to Bates. Bates was reinterviewed by the police, and again he denied having a sexual relationship with Dickson. Bates was arrested, indicted, and tried for Dickson's murder.

[¶ 7] One of Dickson's neighbors testified at trial that a month before the murder Dickson woke up the neighbor in the middle of the night. Dickson was shaking with fear and said that she had awakened to discover Bates sitting on her bed and stroking her hair. The neighbor also recalled a second incident a week before the murder when Dickson showed fear of Bates. A person who worked with Bates testified that Bates told the co-worker that

he had been to Dickson's apartment Thursday night, which was the night of the murder.

[¶ 8] Bates testified at trial that he had been having a sexual affair with Dickson and had sexual intercourse with her the Wednesday before the murder, but he denied raping or murdering Dickson. Bates and his wife lived together in 1994 but later divorced. Over the objection of defense counsel, Bates's former wife testified that on Thursday night, February 17, 1994, Bates left their apartment at approximately ten o'clock and did not come home until three o'clock the next morning.

[¶ 9] During jury selection, an issue arose concerning a newspaper article that had appeared that morning in a Portland newspaper. The article was about the murder, and it stated that Dickson's son, who was eighteen months old at the time of the murder, was found in his playpen in Dickson's apartment where he had apparently been left unattended from the time of Dickson's death until the discovery of her body. Bates had previously asked the court to exclude at trial any evidence concerning the fact that the child had been left with his dead mother for several days, and at the time of jury selection, the court had not yet ruled on the request. After jury selection, the State represented that it would not offer any such evidence, and the presence of the child in the apartment was not a fact put in evidence.

[¶ 10] The court inquired of the seventy-five member venire how many had seen the newspaper article and instructed everyone not to read it. Seventeen people responded that they had already seen the article. After the court asked general questions of the entire venire, the prospective jurors were questioned individually in chambers by counsel and the court. Those who had read the article were specifically asked about it. Most who had read it

were challenged for cause and were excused. The court and counsel continued to individually question enough potential jurors to arrive at the number of thirty-seven, after all challenges for cause had been determined. Included in the thirty-seven were three people who had read the newspaper article, but who had said that they could decide the case based only on the evidence presented at trial; these three were not challenged for cause. The State and the defense counsel exercised their preemptory challenges. A jury of twelve with three alternates was chosen. The jury that deliberated and convicted Bates included the three people who had read the article.

[¶ 11] The jury found Bates guilty of both murder and gross sexual assault. Following the receipt of sentencing memoranda, the court held a sentencing hearing and imposed a life sentence for murder and a thirty-year concurrent sentence on the gross sexual assault conviction. Bates filed an application to allow a sentencing appeal, which we granted and consolidated with his appeal from the convictions.

## II. JUROR ISSUE

[¶ 12] Bates argues that the seating of three jurors who had read the newspaper article denied him a fair and impartial jury. He contends that because of the article these three jurors had information not in evidence—that Dickson's young son had been left in the apartment with his dead mother for three days. Because there was no challenge to these three jurors, we review the court's decision to seat them for obvious error. *State v. Comer*, 644 A.2d 7, 9 (Me.1994).

[¶ 13] Bates argues that it was apparent from several comments made by members of the venire, who were excused for cause, that the presence of the child was a fact

that was extremely disturbing to people. Of the potential jurors who were questioned about the newspaper article, several spontaneously mentioned the child. Several said the fact of the child stuck in their minds. Others who admitted they could not be fair and impartial indicated that it was the fact of the child that affected them. Thus, Bates argues that because there was a highly emotional and prejudicial fact, which was not put in evidence, but was known to the three jurors who had read the newspaper article, he was deprived of a fair and impartial jury.

■ [¶ 14] Potential jurors who have read prejudicial newspaper stories are not automatically excused from jury service. If the potential juror is able to lay aside what he or she has read and base a verdict only on the evidence at trial, there is no error in seating the juror. *See State v. Saucier*, 2001 ME 107, ¶ 20, 776 A.2d 621, 627; *State v. Littlefield*, 374 A.2d 590, 595 (Me.1977). The three jurors who were seated in this case all said that they could render a verdict based on the evidence. All three recognized that newspapers sometimes do not report the facts correctly and stated that they could put aside anything they had read in the newspaper. The individual collogues between the three jurors, court, and counsel failed to demonstrate that these jurors were so affected by the newspaper article that they could not be fair and impartial. Indeed, just the opposite appears to be true. The essence of these three collogues was that the jurors would be fair and impartial, and that is likely the reason that neither the State nor defense counsel challenged them for cause. Bates has not shown that it was error to seat the three jurors or that their participation in his convictions denied him a fair and impartial jury.

## III. MARITAL COMMUNICATION PRIVILEGE

■ [¶ 15] Bates claims that his ex-wife should not have been allowed to testify that, on the night of the murder, he left the marital home at approximately ten o'clock and did not return until three o'clock the next morning. He contends that his conduct of leaving the house was a marital communication intended to be confidential. We review the trial court's determination concerning whether certain testimony should be excluded as privileged for an abuse of discretion. *State v. Boucher*, 652 A.2d 76, 77 (Me.1994).

[¶ 16] The marital communications privilege is set forth in the last sentence of 15 M.R.S.A. § 1315 (2003): "The husband or wife of the accused is a competent witness except in regard to marital communications." This statutory privilege is further refined in M.R. Evid. 504(b), which provides, "A married person has a privilege to prevent his or her spouse from testifying as to any confidential communication from such person to the spouse." A confidential marital communication is defined as one that "is made privately by any person to his or her spouse and is not intended for disclosure to any other person." M.R. Evid. 504(a).

■ [¶ 17] We have acknowledged, in the context of the marital communications privilege, that it is possible for conduct to be a form of communication. *State v. Smith*, 384 A.2d 687, 689–90 (Me.1978). However, in order for the conduct to be considered communication, it must be intended to communicate something to the spouse. *Id.* at 690. Furthermore, we have said that in order for the conduct to be considered a communication coming within the privilege, confidentiality must be an inducing factor. *Id.* at 691. It is difficult to discern what Bates intended to communicate to his wife by leaving his

residence, other than to say, "I am leaving." It is even more difficult to discern how confidentiality was an inducing factor in that conduct.

[¶ 18] Even if we were to agree that Bates's conduct of leaving his marital abode in the presence of his spouse was communication, it is impossible to see how it was intended to be confidential. Bates lived in an apartment complex in South Portland. Leaving his apartment exposed him to any neighbor or passer-by who happened to be watching. We noted in *Smith* that the inquiry concerning confidentiality should focus on "the spouse's reasonable expectation of confidentiality." *Id.* Conduct knowingly exposed to the public cannot form the basis of a claim of a reasonable expectation of confidentiality because it is not reasonable to think that activity exposed to the public should remain private. *Id.* at 692. Because Bates's conduct was not a confidential marital communication, the court did not abuse its discretion in allowing Bates's wife to testify as to his whereabouts on the night of the murder.

## IV. SUFFICIENCY OF THE EVIDENCE

[¶ 19] We review challenges to the sufficiency of the evidence by viewing the evidence in "the light most favorable to the State to determine whether the trier of fact rationally could have found beyond a reasonable doubt every element of the offense charged." *State v. Turner*, 2001 ME 44, ¶ 6, 766 A.2d 1025, 1027.

### A. Murder

[¶ 20] Bates was convicted of the intentional or knowing murder of Dickson. "A person is guilty of murder if ... [h]e intentionally or knowingly causes the death of another human being." 17–A M.R.S.A. § 201(1)(A) (1983).

■ [¶ 21] There was no dispute that Dickson was dead. The primary contested issue was whether Bates caused her death, and it was reasonable for the jury to conclude that he was responsible. Bates's sperm was found in Dickson's vagina; he admitted that he lied to investigators about his involvement with Dickson; and Dickson was afraid of him. There was evidence that he left his residence for several hours on the night of the murder.

[¶ 22] It was not necessary for the jury to eliminate entirely the possible alternative explanation that Quinn or some other person was responsible for Dickson's death; it was only necessary that the jury determine, with reference to all the evidence presented, that such an alternative was not sufficiently credible to raise a reasonable doubt about Bates's guilt. *See State v. Black*, 2000 ME 211, ¶ 14, 763 A.2d 109, 113. Given the totality of the evidence, including the fact that Dickson was afraid of Bates, and the lack of evidence that Dickson had any fear of Quinn, it was rational for the jury to determine beyond a reasonable doubt that Bates was the murderer. There was sufficient evidence to support Bates's conviction for murder.

### B. Gross Sexual Assault

■ [¶ 23] Bates argues that the evidence was not sufficient to convict him of gross sexual assault because it was not sufficient to prove compulsion. "A person is guilty of gross sexual assault if that person engages in a sexual act with another person and ... [t]he other person submits as a result of compulsion." 17–A M.R.S.A. § 253(1)(A). "Compulsion" is defined, in this context, as

[T]he use of physical force, a threat to use physical force or a combination thereof that makes a person unable to physically repel the actor or produces in that person a reasonable fear that death,

serious bodily injury or kidnapping might be imminently inflicted upon that person or another human being.

*Id.* § 251(1)(E) (Supp.2002).

[¶ 24] The jury could have concluded that Bates compelled Dickson to have sexual intercourse from the DNA evidence, Bates's admission that he and Dickson had sexual intercourse, the evidence of Dickson's fear of Bates, and the evidence that Dickson's half-naked body was covered with abrasions. It was reasonable for the jury to conclude that the same physical force that caused Dickson's death by strangulation was also used to overpower Dickson's resistance to sexual intercourse with Bates. There was sufficient evidence to support the conviction for gross sexual assault.

## V. SENTENCE

■ [¶ 25] Bates also appeals the sentence of life imprisonment and argues that a term of years should have been imposed. The first step a court must take in determining a sentence is to consider "the particular nature and seriousness of the offense." 17–A M.R.S.A. § 1252–C(1) (Supp.2002). We have referred to this step as the establishment of the "basic" sentence. *State v. Hewey*, 622 A.2d 1151, 1154 (Me.1993). The basic sentence is determined without regard to the defendant's particular circumstances. We review a court's determination of the basic sentence for misapplication of principle. *State v. Ardolino*, 1997 ME 141, ¶ 24, 697 A.2d 73, 80–81. The second step in the sentencing analysis is the court's determination of the "maximum" sentence, that is, the sentence after applying aggravating and mitigating factors to the basic sentence. 17–A M.R.S.A. § 1252–C(2) (Supp.2002). We review the trial court's application of aggravating and mitigating factors in determining the maximum sentence for abuse of discretion. *Ardolino*, 1997 ME 141, ¶ 26, 697 A.2d at 81.

■ [¶ 26] The court established that the basic sentence for Bates is life imprisonment. In *State v. Shortsleeves*, 580 A.2d 145, 149–50 (Me.1990), we listed attendant circumstances that can justify a life sentence, and one of those is sexual abuse. The *Shortsleeves* case provides a guideline for placing the particular murder along a continuum of criminal conduct. *See State v. Wilson*, 669 A.2d 766, 768 (Me.1996). Here, the court carefully reviewed the facts surrounding Dickson's murder, including the accompanying gross sexual assault. Because Bates forcibly raped Dickson shortly before he murdered her, the court did not misapply sentencing principles in determining the basic sentence to be a life sentence. *See id.* at 769 (holding that court did not misapply sentencing principles in giving a life sentence for murder accompanied by sexual abuse, torture, and extreme cruelty, "any one of which justifies a life sentence").

[¶ 27] The court then moved to the second step in the sentencing analysis, and determined the maximum sentence by considering all other relevant factors including those related to the particular offender. *See Hewey*, 622 A.2d at 1154; 17–A M.R.S.A. § 1252–C(2). The court found that aggravating factors, such as Bates's prior felony convictions, lack of remorse, and refusal to take responsibility, outweighed any mitigating factors. The court did not abuse its discretion in considering and weighing the aggravating and mitigating factors or in determining that the second step in the sentencing analysis did not lead to a reduction in the basic sentence for life.

The entry is:

Judgment and sentence affirmed.