STATE OF MAINE                          UNIFIED CRIMINAL DOCKET
CUMBERLAND, SS.                         CRIMINAL ACTION
                                        DOCKET NO. CR- 2001-1160


STATE OF MAINE               )
                             )
                             )          **ORDER ON DEFENDANT'S MOTION**
V.                           )          **FOR NEW TRIAL**
                             )
                             )
FOSTER BATES                 )

NOV 14 PM3:02

Defendant moves the Court to grant a new trial pursuant to 15 M.R.S. 2138(10)(C) based on DNA evidence found after trial.

I.    **FACTS**

The facts of this case are set forth more fully in *State v. Bates*, 2003 ME 67, 822 A.2d 1129. In summary, the body of Tammy Dickson was found in her apartment in the Courtland Courts apartment complex in South Portland on February 20, 1994. Her hands and feet were bound behind her, a green sock was stuffed in her mouth, and she was naked from the waist down. The medical examiner concluded that the cause of death was strangulation and that she had been dead for several days. Ms. Dickson's 18-month-old son was found alive in his playpen.

The police interviewed numerous people, including William Quinn and Defendant. Mr. Quinn was Ms. Dickson's on-again/off-again boyfriend. He had a key to Ms. Dickson's apartment and was the one who found her body after her neighbor asked him to check on her. Defendant and his then-wife were neighbors of Ms. Dickson. Defendant initially denied having any relationship with Ms. Dickson, except that she occasionally babysat for his child. The police obtained blood samples from Mr. Quinn and Defendant.

1

Two years later, the DNA results became available. The results showed that Mr. Quinn's semen was found on a robe near Ms. Dickson's body. After further police questioning, Mr. Quinn admitted that he had been drinking heavily on the night of the murder and may have gone to Ms. Dickson's apartment and had sex with her. He also disclosed that there had been a green sock in Ms. Dickson's mouth, which was information that had not been released to the public.

The vaginal swabs taken from Ms. Dickson were initially inconclusive. However, several years later, additional tests were performed with newer technology. The results of those tests matched the sperm cells on the vaginal swab to Defendant. On August 10, 2001, a grand jury returned an indictment charging Defendant with intentional or knowing murder in violation of 17-A M.R.S. § 201(1)(A) and gross sexual assault in violation of 17-A M.R.S. § 253(1)(A).

At trial, Defendant testified that he had been having an affair with Ms. Dickson and had had sex with her the day before the murder, but he denied raping and murdering her. Defendant's former wife testified that Defendant left their apartment at approximately 10pm on the night of the murder and did not return until 3am the next morning. Defendant's co-worker testified that Defendant said he had been to Ms. Dickson's apartment on the night of the murder. In addition, one of her neighbors testified that, approximately one month before the murder, Ms. Dickson awoke in the middle of the night to discover Defendant sitting next to her and stroking her hair.

On July 22, 2002, Defendant was convicted of both counts. He was sentenced to life imprisonment for the murder and a concurrent thirty-year sentence for the sexual assault. On May 8, 2003, the Law Court affirmed the judgments of conviction and Defendant's sentences. *Bates*, 2003 ME 67, 822 A.2d 1129. On August 29, 2003, Defendant filed a petition for post conviction review, which this court denied on September 5, 2007.

2

On January 10, 2005, Defendant filed a motion for preservation of DNA evidence, which the court granted on January 18, 2005. On September 4, 2007, Defendant filed a motion to release trial evidence for DNA testing pursuant to 15 M.R.S. § 2137. The court granted Defendant's motion on April 29, 2008. The court ordered that a second vaginal smear slide, two hairs from Ms. Dickson's buttocks, one hair from her thigh, and three hairs from the back of her shirt undergo nuclear DNA testing. The court also ordered that nine items of previously tested evidence—two hairs from Ms. Dickson's buttocks, one hair from a belt found near her body, the bindings on her hands and feet, the sock found in her mouth, two hairs from pubic combings, and rectal and oral swabs—undergo mitochondrial DNA testing.

On March 2, 2010, the New Jersey State Police Office of Forensic Sciences issued a report on the results of the tests performed on the hairs from her thigh, buttocks, shirt, and pubic combings. The report showed that, except for one hair from her shirt, which was inconclusive, the hairs exhibited "the same physical and microscopic characteristics as the control head hair sample from the victim," and therefore "could have originated" from Ms. Dickson. The report does not mention anyone other than Ms. Dickson as a potential source of these hairs.

On April 8, 2010, the Maine State Police Crime Laboratory prepared a report on the result of the tests performed on the hairs from her buttocks and thigh, the hair from the belt, the anal and oral swabs, and the second vaginal smear. The report showed that one of the hairs from her thigh and the hairs from her shirt were not tested due to an insufficient amount of DNA. The bindings on her hands and feet and the green sock were not tested for reasons that are not specified in the report. In addition, the results from the second vaginal smear, the anal swab, and the oral swab were inconclusive. However, the hair from her buttocks, one of the hairs from her

3

thigh, and the hair from the belt matched Ms. Dickson. The report does not mention anyone other than Ms. Dickson as a potential source of this evidence.

A hearing on the results was scheduled for December 15, 2014. On December 12, 2014, Defendant filed a motion to continue the hearing. The motion, which was filed under seal, asserts that Defendant's counsel, Neil Raphael, "recently discovered new information regarding a potential alternate suspect, requiring further investigation, and further analysis of the DNA sample at issue, in order to fully present his Motion for New Trial to this Court."

Attorney Raphael's affidavit in support of the motion states that, in October 2014, he learned that a woman named Melody Higgins had been trying to reach him. He called Ms. Higgins, who told him that, on the morning after Ms. Dickson's murder, Ms. Higgins received a phone call from her sister, Cindy Bridges. Ms. Bridges told Ms. Higgins that her then-boyfriend, Michael Bridges, had just come home drunk and screamed at her that "he killed a girl" and "there was a baby in the playpen." He also allegedly mentioned something about a sock in Ms. Dickson's throat. Attorney Raphael determined that Mr. Bridges was an uncle of one of Ms. Dickson's neighbors. Attorney Raphael further states that there was unknown DNA on the sock, and if he is able to verify this information regarding Mr. Bridges, he will seek additional DNA testing on Mr. Bridges and the sock. The court continued the hearing until June 13, 2016.

## II.    DISCUSSION

Before the Court is Defendant's Motion for New Trial. Maine's post conviction DNA statute provides:

> If the results of the DNA testing under this section show that the person is not the source of the evidence, the person authorized in section 2137 must show by clear and convincing evidence that:
>
> A. Only the perpetrator of the crime or crimes for which the person was convicted could be the source of the evidence, and that the DNA test

4

results, when considered with all the other evidence in the case, old and new, admitted in the hearing conducted under this section on behalf of the person show that the person is actually innocent. If the court finds that the person authorized in section 2137 has met the evidentiary burden of this paragraph, the court shall grant a new trial;

B. Only the perpetrator of the crime or crimes for which the person was convicted could be the source of the evidence, and that the DNA test results, when considered with all the other evidence in the case, old and new, admitted in the hearing conducted under this section on behalf of the person would make it probable that a different verdict would result upon a new trial; or

C. All of the prerequisites for obtaining a new trial based on newly discovered evidence are met as follows:

1. The DNA test results, when considered with all the other evidence in the case, old and new, admitted in the hearing conducted under this section on behalf of the person would make it probable that a different verdict would result upon a new trial;
2. The proffered DNA test results have been discovered by the person since the trial;
3. The proffered DNA test results could not have been obtained by the person prior to trial by the exercise of due diligence;
4. The DNA test results and other evidence admitted at the hearing conducted under this section on behalf of the person are material to the issue as to who is responsible for the crime for which the person was convicted; and
5. The DNA test results and other evidence admitted at the hearing conducted under this section on behalf of the person are not merely cumulative or impeaching, unless it is clear that such impeachment would have resulted in a different verdict.

15 M.R.S. § 2138(10) (2015). "[A]ll the other evidence in the case, old and new," means:

[T]he evidence admitted at trial; evidence admitted in any hearing on a motion for new trial pursuant to Rule 33 of the Maine Rules of Criminal Procedure; evidence admitted at any collateral proceeding, state or federal; evidence admitted at the hearing conducted under this section relevant to the DNA testing and analysis conducted on the sample; and evidence relevant to the identity of the source of the DNA sample.

5

*Id.* § 2138(10)(C). "In other words, evidence admitted at the trial or in any prior collateral proceeding concerning, inter alia, the time of the victim's death, alternative suspects, or the defendant's confessions must be considered by the court in deciding a motion for a new trial based on new DNA analysis." *State v. Dechaine*, 2015 ME 88, ¶ 38, 121 A.3d 76. However, the court may "consider only two kinds of *new* evidence—that relevant to the DNA testing and analysis conducted on the sample, and that relevant to the identity of the source of the DNA sample." *Id.* ¶ 39 (citation omitted). "The statute says nothing about reopening or supplementing the evidence introduced at prior proceedings; rather it allows the admission of DNA-related evidence that could not have been known at those prior proceedings, namely the new DNA results and their impact on identifying the perpetrator." *Id.*

In the case *State v. Reese*, 2013 ME 10, the Law Court affirmed the Superior Court denial of new trial pursuant to 15 M.R.S. § 2138(10) based upon findings that the DNA evidence could have come from a party other than the perpetrator and that there was not clear and convincing evidence that the new DNA results made it probable that a different verdict would result upon a new trial. The victim was found dead, buried approximately 150 feet behind the defendant's mother's home with duct tape binding her wrists. *State v. Reese*, 2013 ME 10, ¶¶ 5, 6; 60 A.3d 1277. After a trial in which the defendant was found guilty of intentional and knowing murder, DNA testing was performed on a print found on the duct tape binding the victims wrists. *Id.* at ¶ 6. The testing ruled out the defendant as a potential contributor of the DNA on the duct tape. *Id.* at ¶ 6. The defendant moved the Superior Court for a new trial pursuant to 15 M.R.S. § 2138(10). *Id.* at ¶ 9. The court denied the defendant's motion on the basis that it was possible that the DNA evidence found on the duct tape was contributed by someone other than the perpetrator and on the basis that the new DNA evidence did not necessarily make it probable that a different verdict

6

would result upon a new trial. Therefore, the defendant did not meet the requirements for new trial pursuant to 15 M.R.S. § 2138(10)(A), (B), or (C). *Id.* at ¶ 18. The Law Court affirmed the Superior Court's determination. *Id.* at ¶ 32.

In the current case, as in *State v. Reese*, post trial DNA evidence has been found that could not have been contributed by the defendant. In *State v. Reese*, the evidence was found on duct tape on the victims arms and hands; in this case, the DNA evidence was found on a sock found in the victims mouth. In both cases, it is likely that the item containing DNA evidence on it was applied to the victim at the time of the commission of the crime. In both cases, it is possible that the DNA was contributed to the item at sometime other than during the commission of the crime.

The Law Court upheld the Superior Court's finding in *State v. Reese* because the DNA results, "when considered with all the other evidence in the case, old and new, admitted in the hearing conducted under this section on behalf of the person [do not] make it probable that a different verdict would result upon a new trial". *Id.* at ¶ 32; 15 M.R.S. § 2138(10). Similar to in Reese, the evidence in the record implicating Defendant Bate is substantial and not eclipsed by the newly found DNA evidence.

Because the Court determines that the DNA on the sock could have been contributed by someone or some ones other than the perpetrator of the crime, the Court finds that Defendant Bates does not meet the requirements of 15 M.R.S. § 2138(10)(A) or (B).

15 M.R.S. § 2138(10)(C) does not require a showing that the DNA evidence necessarily was contributed by the perpetrator of the crime, but it does require clear and convincing evidence that "[t]he DNA test results, when considered with all the other evidence in the case, old and new, admitted in the hearing conducted under this section on behalf of the person would make it

7

probable that a different verdict would result upon a new trial". At trial, DNA test results from the victim's post-mortem vaginal swab were offered showing a match with Defendant's sperm. Defendant testified that he had been having affair with the victim and had engaged in consensual intercourse with her the day before the murder. Defendant denied having raped or murdered her. Testimony was offered at trial by Defendant's ex-wife, with whom he was living at the time of the murder, that Defendant left their apartment at approximately ten o'clock and did not come home until three o'clock the next morning on Thursday night, February 17, 1994. Additionally, a neighbor of the victim testified at trial that a month before the murder Dickson woke up the neighbor in the middle of the night and found Bates sitting on her bed and stroking her hair. Defendant has not presented such clear and convincing evidence that the new evidence, in light of all of the evidence already in the record, would create a different result in a new trial. Therefore, the Court denies Defendant's motion for new trial.

Defendant also argues that the new DNA evidence would alter the outcome of a new trial because it would allow Defendant to offer evidence of an alternate suspect. Defendant contends that because the DNA test did not rule out the Mr. Bridges as a potential source of DNA evidence on the sock that was inside the victim's mouth, there is enough evidence to present an alternate suspect theory if a new trial is granted. Although the trial transcript is not in the record, it appears that an alternative suspect theory regarding Mr. Bridges was not presented at trial. (*See* Raphael Aff. ¶ 14 (stating that he had never heard of Mr. Bridges before Ms. Higgins' phone call).) The transcript of the PCR hearing shows that Mr. Bridges was never mentioned. Because evidence regarding Mr. Bridges is therefore new evidence, it must be relevant to the DNA testing or to the identity of the source of the DNA sample. As discussed above, the new DNA results were either inconclusive or matched Ms. Dickson. Although Attorney Raphael claims there was

unknown male DNA on the sock, there are no new results from the sock because it was not tested. Any evidence regarding Mr. Bridges should therefore be excluded from the hearing because the DNA results do not implicate Mr. Bridges.[1] *See Deschaine*, 2015 ME 88, ¶¶ 36-37, 121 A.3d 76 (affirming Superior Court's order allowing Dechaine to introduce only "evidence relating to an alternative suspect . . . to the extent that the DNA evidence and analysis actually implicates the alternative suspect"). Maine's post conviction DNA statute, as interpreted by the Law Court, limits the evidence at the hearing for a new trial to the new DNA results and their impact on identifying the perpetrator. Because the new DNA results do not raise the possibility of another perpetrator, any evidence regarding Mr. Bridges is irrelevant and inadmissible. The Court does not consider Ms. Higgin's statements in this Motion for New Trial.

## III.   CONCLUSION

The Court Denies Defendant's Motion for New Trial.

Date: _November 14, 2016_

Roland Cole
Chief Justice, Superior Court

---

[1] Defendant's other options for pursuing his alternative suspect theory would be a new PCR hearing or a new trial based on newly discovered evidence. However, it appears his claim is time-barred under both of these options. A PCR petition must be filed within one year of the date on which the factual predicate of the claim could have been discovered, which was approximately October 2014, when Attorney Raphael first learned of Mr. Bridges. 15 M.R.S. § 2128-B(1)(C) (2015). Similarly, a motion for a new trial based on newly discovered evidence must be made within two years of the entry of judgment. M.R.U. Crim. P. 33.