MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:      2021 ME 25
Docket:        Cum-20-199
Argued:        March 10, 2021
Decided:       April 29, 2021

Panel:         MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.

STATE OF MAINE

v.

NOAH GASTON

JABAR, J.

[¶1]  In the early morning hours of January 14, 2016, Alicia Gaston died after Noah Gaston shot her with a shotgun.  In November 2019, a jury found Gaston guilty of intentional or knowing murder, 17-A § 201(1)(A) (2021), and the court (Cumberland County, *Murphy, J.*) later entered a judgment of conviction on the verdict, sentencing Gaston to forty years in prison.  We affirm the conviction and sentence.

## I.  BACKGROUND

[¶2]  Viewing the evidence in the light most favorable to the State, the jury rationally could have found the following facts beyond a reasonable doubt. *See State v. Ouellette*, 2019 ME 75, ¶ 11, 208 A.3d 399.

2

[¶3]  Noah Gaston stated that in the early morning hours of January 14, 2016, he heard a walkie-talkie-type noise that he thought came from intruders in the home.  He checked on his two-year-old son, who was sleeping in the bed he and his wife shared; came out of his bedroom on the second floor; checked on his eight- and nine-year-old daughters, who were sleeping in their own rooms; and, while standing at the top of the stairs, he fired his shotgun once at a person located on the stairs.

[¶4]  That person was his wife, Alicia Gaston.  Gaston called 9-1-1, stating that he had just killed his wife, and the 9-1-1 dispatcher told him to start CPR.  The police officers arrived on scene at 6:17 a.m.  Alicia Gaston died from a gunshot injury to her abdomen and hand.

[¶5]  On March 10, 2016, a grand jury indicted Gaston on one count of intentional or knowing murder, 17-A M.R.S. § 201(1)(A), and one count of manslaughter,[1] 17-A M.R.S. § 203(1)(A) (2021).[2]  Gaston pleaded not guilty to both counts.

---

[1]  This count was later dismissed and instead the jury was instructed that it could consider manslaughter as a lesser included offense.

[2]  The indictment also alleges in each count the use of a firearm in violation of 17-A M.R.S. § 1158-A(1)(B) (2016).  Section 1158-A was repealed and replaced after the commission of the charged crimes.  See P.L. 2019, ch. 113, §§ A-1, A-2 (emergency, effective May 16, 2019) (codified at 17-A M.R.S. § 1504 (2021)).

[¶6]   In a pretrial motion in limine, Gaston sought to claim a religious privilege, M.R. Evid. 505, to exclude from the evidence at trial statements that he made to two church leaders who picked him up from the police station on the day of the shooting.  The State opposed the motion in limine, arguing that the church leaders were not clergy and, even if they were, Gaston had waived the privilege because he later disclosed the statements to third parties.  On January 28, 2019, the court held a hearing on the motion at which the two church leaders testified regarding their conversation with Gaston, and the court took the matter under advisement.

[¶7]   While the motion in limine was under advisement, the State reported to Gaston and the court that it had obtained a recording of a conversation between Gaston and a visitor at the jail.  At a hearing on February 8, 2019, the State summarized that conversation as follows:

> Mr. Gaston recounts to [the visitor] that they have now had the [motion in limine] hearing, that [the church leaders] have testified, and [Gaston] says essentially that I had a conversation with [the church leaders], that it was in the car, not at the church as one [of the church leaders] said.  And Mr. Gaston affirms that he said to [the church leaders on the day of the shooting], "That's what I have to say."  He claims in the conversation with [the visitor] that he then said immediately after that something about the children but that when he said "That's what I have to say," he meant it in a sarcastic way and that they completely misconstrued the meaning of what he said.

4

The State contended that Gaston had waived his religious privilege by disclosing to the visitor at the jail the contents of his conversation with the church leaders.  Gaston contended that this disclosure did not constitute a waiver because everything he recounted had already been said in open court.

[¶8]  The court denied the motion in limine, determining that Gaston could not claim the religious privilege.  The court found that the church leaders were individuals with a religious role and status.  However, the court found that the statements made to the visitor at the jail constituted a waiver of the privilege because "[Gaston] [was] ratifying the statements he made [to the church leaders] . . . and he [was] qualifying them in a way that makes it consistent with his theory that [the shooting] was an accident."  *See e.g.*, *State v. Fournier*, 2019 ME 28, ¶¶ 24-26, 203 A.3d 801.

[¶9]  The court conducted an eight-day jury trial in November 2019.[3]  The State's witnesses included both of the church leaders, and the following exchange occurred with one of those leaders:

> PROSECUTOR: When Mr. Gaston at the church finished telling you his version of the shooting of

---

[3] The court had previously held a jury trial starting on February 11, 2019.  However, that trial resulted in a mistrial after the court found "a manifest necessity," but since Gaston consented to the finding, the court concluded that "there was no constitutional bar to retrying Mr. Gaston before a different jury."

his wife, did he then say something that was particularly notable to you?

CHURCH LEADER: Yes.

PROSECUTOR: After he told you his version of the shooting, what was the notable thing that he said to you?

CHURCH LEADER: Ah, he said that – well, we asked him if there was anything else that he wanted to tell us and he said no, and that this was the only story that he could tell if he wanted to see his children again.

. . .

PROSECUTOR: . . . Did [the other church leader] say anything to [Mr. Gaston] after [Mr. Gaston]'s statement about this is the only thing I can say?

CHURCH LEADER: Yes.

PROSECUTOR: What did [the other church leader] say to [Mr. Gaston]?

CHURCH LEADER: "Is there another story you could tell?"

PROSECUTOR: And did Mr. Gaston answer . . . ?

CHURCH LEADER: Yes.

PROSECUTOR: What did he say?

CHURCH LEADER: He said, no, that's – that's what happened.

[¶10]  At the close of the evidence, the State and Gaston discussed the court's proposed jury instructions and verdict form.[4]  Gaston contended that "in the case of an intentional or a knowing murder where depraved indifference is not charged, the intent has to be specific both to the idea of killing and to the

---

[4] Gaston and the State had each submitted proposed jury instructions to the court.

6

idea of a specific person. It can't be just someone who ends up dying." The State

responded that the statute requires only the death of another human being.

[¶11] The court added Alicia Gaston's name in the instructions where

appropriate, but the court was not persuaded by Gaston's argument that the

State had to prove, as an additional element, that the defendant intended to kill

the person whom he had, in fact, killed. The following instructions were given

to the jury:

> The law of the State of Maine provides that: A person is guilty of murder if the person intentionally or knowingly causes the death of another human being. In order for the State to prove beyond a reasonable doubt that Noah Gaston committed the crime of murder, the State must convince you beyond a reasonable doubt of the following three facts: First, that another person, Alicia Gaston, is dead; Second, that Noah Gaston caused her death, which means that Ms. Gaston's death would not have occurred *but for* Mr. Gaston's conduct; and, Third, that Mr. Gaston acted either intentionally or knowingly when he caused Alicia Gaston's death. A person causes death "intentionally" if it is his conscious object to cause another person's death. On other hand, a person causes death "knowingly" if he is aware that it is practically certain that his conduct will cause another person's death.

The jury returned a guilty verdict on one count of murder and found "that the

crime of murder was committed with a firearm against a person."

[¶12] After the verdict, Gaston renewed his motion for judgment of

acquittal and made a motion for a new trial based on his argument that the State

was required to prove an intent to kill a specific person. The court denied both

motions, stating that "any rational fact-finder could have found beyond a reasonable doubt that Mr. Gaston acted intentionally or knowingly when he caused the death of Alicia Gaston" considering that from the testimony a "rational jury could have unanimously found beyond a reasonable doubt that Mr. Gaston actually knew that the person coming up the stairs was in fact his wife, Alicia Gaston, when he discharged a shotgun into her abdomen when standing in relatively close proximately to her." The court also determined that the jury instructions were appropriate.

[¶13] On June 17, 2020, Gaston filed a motion to continue the sentencing hearing on the ground that the COVID-19 restrictions imposed to protect the health and safety of those involved in a hearing unfairly restricted his due process rights. The court denied the motion after considering the need to balance access to courtrooms with the health and safety of participants; the four years that had passed since the events; and Gaston's constitutional right to a speedy trial.

[¶14] At the sentencing hearing, the court set the basic sentence at thirty-five years. The court described the slaying of Alicia Gaston as a "completely unprovoked, impulsive act of domestic violence," but placed it in the "lower quartile of basic sentences."

[¶15] The court identified Gaston's lack of a criminal record, his actions when the EMTs arrived, and his childhood experiences as mitigating factors. The court stated that it did not consider Gaston's "failure to be a good provider" or whether or not he had genuine remorse; however, the court did consider Alicia Gaston's conscious pain and suffering and the profound impact on Alicia Gaston's family. The court ultimately determined that "particularly given the victim impact in this case . . . the aggravating factors do outweigh the mitigating factors, resulting in a final sentence of 40 years to the Department of Corrections."

[¶16] Gaston appealed his conviction and the sentence, and the Sentence Review Panel granted his application for review of his sentence. *See* 15 M.R.S. §§ 2115, 2151-2157 (2021); M.R. App. P. 2B(b)(1), 20; *State v. Gaston*, No. SRP-20-200 (Me. Sent. Rev. Panel Aug. 12, 2020).

## II. DISCUSSION

[¶17] Gaston challenges the court's denial of his claim of religious privilege; the court's refusal to use his requested jury instructions; the court's denial of his motion to continue the sentencing hearing; and the court's calculation of both the basic and maximum sentence.

A.      Religious Privilege

[¶18]  "We review the legal issues regarding the nature and scope of the privilege . . . de novo and [we] review the factual findings for clear error."  *Harris Mgmt., Inc., v. Coulombe*, 2016 ME 166, ¶ 12, 151 A.3d 7; *see Fournier*, 2019 ME 28, ¶ 24, 203 A.3d 801.

[¶19]  "A person has a privilege to refuse to disclose, and to prevent any other person from disclosing, a confidential communication made to a member of the clergy who was acting as a spiritual adviser at the time of the communication," but that privilege is waived "if the person or the person's predecessor *while holding* the privilege voluntarily discloses or consents to the disclosure of any significant part of the privileged matter."  M.R. Evid. 505(b), 510(a) (emphasis added); *see also* M.R. Evid. 511 ("A privilege is not waived by a disclosure that was: (a) [c]ompelled erroneously; or (b) [m]ade without opportunity to claim the privilege.").

[¶20]  Gaston contends that the court erred when it found that he voluntarily waived his religious privilege by disclosing to the visitor at the jail his communications with the two church leaders because he was only reporting what the church leaders had already said in open court.  However, the conversation with the visitor at the jail was much more than that.  In speaking

10

with the visitor, Gaston corrected the church leader's account that the conversation took place in the church, informing the visitor that it was actually in a car, and Gaston told the visitor that he was being sarcastic in the conversation with the church leaders when he reported that "[t]hat's what I have to say" if he wanted to keep his children. As the court stated, Gaston provided commentary and ratified the statements he had made to the church leaders to make it consistent with his theory of the events.

[¶21] Additionally, contrary to Gaston's contention, the fact that the content of the confidential communication was discussed three years after the statement was made creates no barrier to a court's determination that he had waived the privilege. *See e.g., State v. Boucher*, 652 A.2d 76, 77-78 (Me. 1994).

[¶22] The court correctly applied the law, and there is competent evidence supporting the court's finding that Gaston disclosed to a third party a significant part of the confidential communications that he had made to the church leaders. The court did not err in determining that Gaston had waived the religious privilege.[5] *See Harris Mgmt., Inc.*, 2016 ME 166, ¶ 12, 151 A.3d 7.

---

[5] In furtherance of his argument that his privilege was violated, Gaston argues that protection of the right to worship is broader under article I, section 3 of the Maine Constitution than under the First Amendment of the U.S. Constitution. *See* Me. Const. art. I, § 3; U.S. Const. amend. I. But the issue here is not the breadth of the constitutional protection, or even the breadth of the privilege under Rule 505, but rather whether the privilege was waived. *See* M.R. Evid. 510.

B.    Jury Instructions

[¶23]   Gaston contends that the court erred by declining to give his requested jury instruction that the State was required to prove that he intentionally or knowingly killed Alicia Gaston and not just intentionally or knowingly killed another human being.[6]

[¶24]  We review for prejudicial error the trial court's denial of a request for jury instructions.  *State v. Doyon,* 1999 ME 185, ¶ 7, 745 A.2d 365.  "[W]e review jury instructions in their entirety to determine whether they presented the relevant issues to the jury fairly, accurately, and adequately, and we will vacate the court's judgment only if the erroneous instruction resulted in prejudice."  *State v. Hansley*, 2019 ME 35, ¶ 8, 203 A.3d 827 (quotation marks omitted).   A party can demonstrate that the court erred by failing to give a requested instruction only when the instruction "(1) states the law correctly; (2) is generated by the evidence in the case; (3) is not misleading or confusing;

---

[6] Gaston also contends that his due process rights were violated when the State included Alicia Gaston's name in the indictment instead of the phrase "another human being."  Although the indictment included Alicia Gaston's name, it also included that it was "all in violation of 17-A M.R.S. § 201(1)(A)"; this statute requires that the defendant cause the death of another human being. 17-A M.R.S. § 201(1)(A) (2021).  Therefore, the indictment was sufficient to apprise Gaston of the charge against him and allow him to prepare a defense; the fact that the State put a specific name in the indictment does not change the elements required by the statute. *See State v. Gauthier*, 2007 ME 156, ¶ 17, 939 A.2d 77 ("The test for determining whether an indictment is sufficient is whether an accused of reasonable and normal intelligence would, by the language of the indictment, be adequately informed of the crime charged and the nature thereof, so that the accused could properly prepare his defense." (alteration omitted) (quotation marks omitted)).

and (4) is not otherwise sufficiently covered in the court's instructions." *State v. Gauthier*, 2007 ME 156, ¶ 15, 939 A.2d 77.

[¶25]  "A person is guilty of murder if the person[] [i]ntentionally or knowingly causes the death of another human being."  17-A M.R.S. § 201(1)(A). Here, the jury instructions quoted the statutory language and then listed each element that the State needed to prove: (1) "that another person, Alicia Gaston, is dead"; (2) that but for Gaston's conduct, her death would not have occurred and; (3) that he acted intentionally or knowingly to cause the death.

[¶26]  In *State v. Mann*, the defendant argued that the proposed jury instruction "needed to inform the jury that prosecutors bore the burden of proving that the fatal blow was not inflicted in self-defense."  2005 ME 25, ¶ 11, 868 A.2d 183.  In that case, we stated that "[e]ven if we assume[d] that [the defendant]'s proposed instruction adequately state[d] Maine law, was generated by the evidence, and was not misleading or confusing, the trial court's instructions adequately covered the prosecution's burden of proof."  *Id.* We concluded that "[w]hen jury instructions closely parallel the provisions of the Maine Criminal Code, they are adequate to provide the jury with the necessary information."  *Id.* ¶ 13.

[¶27] Here, the court's instructions closely paralleled the language of the statute, and the court properly denied Gaston's request for additional jury instructions.

C. Motion to Continue

[¶28] Gaston contends that the court erred when it denied his motion to continue the sentencing hearing because he was denied his Sixth Amendment right to a public trial and right to confront witnesses. *See* U.S. Const. amend. VI.[7] "We review a court's denial of a motion to continue for an abuse of discretion examining whether the denial had any adverse prejudicial effect on the movant's substantial rights and viewing each case largely upon its own facts and circumstances." *State v. Dube*, 2014 ME 43, ¶ 13, 87 A.3d 1219 (quotation marks omitted) (citation omitted).

[¶29] We are not persuaded by Gaston's arguments that the Sixth Amendment Confrontation Clause applies to sentencing proceedings. *See United States v. Hinkley*, 803 F.3d 85, 92 (1st Cir. 2015) ("[T]here is no Confrontation Clause right at sentencing. The sentencing court has broad discretion to accept relevant information without regard to its admissibility

---

[7] Gaston argues that there was a violation of his right to confrontation under the Sixth Amendment of the U.S. Constitution, and not the Maine Constitution, article I, section 6. *See* U.S. Const. amend. VI; Me. Const. art. I, § 6.

under the rules of evidence applicable at trial, as long as it concludes that the information has sufficient indicia of reliability." (citation omitted)); *United States v. Luciano*, 414 F.3d 174, 178-80 (1st Cir. 2005)*.*

[¶30]  We are also not persuaded by Gaston's arguments that he was denied a public trial.  *See* U.S. Const. amend. VI.[8]  "The goals advanced by the public-trial guarantee are 1) to ensure a fair trial; 2) to remind the prosecutor and judge of their responsibility to the accused and the importance of their functions; 3) to encourage witnesses to come forward; and 4) to discourage perjury." *Roberts v. State*, 2014 ME 125, ¶ 19, 103 A.3d 1031 (quotation marks omitted).  Even if these goals applied to a sentencing hearing, the court crafted a thorough and thoughtful plan that ensured that the hearing was safely open to the public so that the case, which had been going on for four years, could finally reach a conclusion.

[¶31]  The court was faced with a global pandemic and restrictions on courtroom access and courtroom occupancy applicable to all Maine state courts.[9]  The court decided to hold the contested sentencing hearing after

---

    [8] Gaston argues that there was a violation of his right to a public trial under the Sixth Amendment of the U.S. Constitution, and not the Maine Constitution, Art. I, § 6.  *See* U.S. Const. amend. VI; Me. Const. art. I, § 6.

    [9] Version Six of the Judicial Branch's Pandemic Management Order was in place at the time of the sentencing hearing and states that "proceedings will be governed by the latest version of the Judicial Branch COVID-19 Phased Management Plan."  PMO-SJC-1 State of Maine Judicial Branch Pandemic

"extensive planning and cooperation of counsel, members of the Office of Information Technology, who work for the State of Maine, the Marshal Service, the Clerk's Office, and other people who work for the Administrative Office of the Courts" to ensure access to the proceeding. In creating this plan, the court properly considered Gaston's constitutional rights while balancing the safety restrictions needed during the pandemic.

[¶32] Anyone who wanted to address the court or access the proceeding was able to do so, despite the pandemic restrictions. The court did not abuse its discretion by denying the motion to continue, and the sentencing hearing did not result in actual prejudice. *See Dube*, 2014 ME 43, ¶ 13, 87 A.3d 1219 ("Although the trial court's discretion must be exercised judiciously and with an eye toward fundamental fairness, even the arbitrary denial of a continuance cannot sink to the level of a due process violation unless it results in actual prejudice." (quotation marks omitted)).

---

Order (amended May 28, 2020). Version One of the Phased Management Plan was effective at that time and it did not explicitly permit contested sentencing hearings to be scheduled. COVID-19 Phased Management Plan Version One State of Maine Judicial Branch (May 27, 2020).

16

D.    Sentence

[¶33]  Finally, we address Gaston's challenge to the court's calculation of the basic sentence and the maximum sentence.[10]  "A person convicted of the crime of murder must be sentenced to imprisonment for life or for any term of years that is not less than 25."  17-A M.R.S. § 1251 (2016).[11]  In fashioning a murder sentence, a court is required to complete two steps: "First, the court determines the basic term of imprisonment based on an objective consideration of the particular nature and seriousness of the crime.  Second, the court determines the maximum period of incarceration based on all other relevant sentencing factors, both aggravating and mitigating, appropriate to that case, including the character of the offender and the offender's criminal history, the effect of the offense on the victim and the protection of the public interest."  *State v. De St. Croix*, 2020 ME 142, ¶ 5, 243 A.3d 880 (citations

---

[10]  Gaston also contends that the court abused its discretion when setting his final sentence and violated his constitutional rights by not setting his basic sentence at or near the mandatory minimum of twenty-five years.  We do not find these arguments persuasive and do not discuss them further.

[11]  Title 17-A M.R.S. § 1251 (2016) has since been repealed and replaced, but the new sentencing statute contains the same requirement.  P.L. 2019, ch. 113, §§ A-1, A-2 (emergency, effective May 16, 2019) (codified at 17-A M.R.S. § 1603 (2021)); *see State v. De St. Croix*, 2020 ME 142, ¶ 6 n.3, 243 A.3d 880 (noting that a person convicted of a crime "must be punished pursuant to the law in effect at the time of the offense rather than at the time of sentencing" (quotation marks omitted)).

omitted) (alteration omitted) (quotation marks omitted); *see* 17-A M.R.S. § 1252-C (2016);[12] *State v. Hewey*, 622 A.2d 1151, 1154-55 (Me. 1993).

1.    Basic Sentence

[¶34] A basic sentence will be reviewed de novo, *State v. Cookson,* 2003 ME 136, ¶ 38, 837 A.2d 101, and will "survive appellate scrutiny unless it appears to err in principle," *State v. Nichols,* 2013 ME 71, ¶ 13, 72 A.3d 503 (quotation marks omitted). In *State v. Schofield*, we explained that at step one "the sentencing court . . . is required to measure the defendant's conduct on a scale of seriousness against all possible means of committing the crime in order to determine which acts deserve the most punishment." 2006 ME 101, ¶ 11, 904 A.2d 409. "[T]he sentencing court is not required to elucidate all the possible means by which the defendant's crime may be committed, find which method of commission is worse than the defendant's or which method is the worst possible way of committing the crime, and then assign the basic sentence according to where the defendant's conduct falls on that spectrum." *Id.*

[¶35] Here, based on its determination that Gaston was guilty of an act of domestic violence that was impulsive rather than premeditated, the court set

---

[12] Title 17-A M.R.S. § 1252-C (2016) has since been repealed and replaced; the two versions of the sentencing statute contain the same requirements. P.L. 2019, ch. 113, §§ A-1, A-2 (emergency, effective May 16, 2019) (codified at 17-A M.R.S. § 1602 (2021)).

18

the basic sentence at thirty-five years.[13] The court appropriately placed Gaston's conduct along a continuum of seriousness, and there was no misapplication of principle when it set the basic sentence. *Nichols*, 2013 ME 71, ¶ 31, 72 A.3d 503.

2. Maximum Sentence

[¶36] "We review the trial court's application of aggravating and mitigating factors in determining the maximum sentence for abuse of discretion." *State v. Bates*, 2003 ME 67, ¶ 25, 822 A.2d 1129; *see State v. Ardolino,* 1997 ME 141, ¶ 26, 697 A.2d 73. As mitigating factors, the court considered Gaston's childhood experiences, his lack of any criminal record, and his application of CPR to his wife. As aggravating factors, the court considered Alicia Gaston's pain and suffering before she died, and the impact of her death on her family. Contrary to Gaston's argument, the court acted well within its discretion in reaching the maximum sentence of forty years. *See Bates*, 2003 ME 67, ¶ 25, 822 A.2d 1129.

---

[13] Although the court did not explicitly mention it when it determined the basic sentence, Gaston's three minor children were in close proximity to the shooting, and this fact can be properly considered at step one. *State v. Leng,* 2021 ME 3, ¶ 21, 244 A.3d 238 ("Here, the court properly considered the presence of the victim's children at the murder in setting the basic sentence at the higher end of the range."); *see also State v. Weyland*, 2020 ME 129, ¶ 36, 240 A.3d 841 ("Accordingly, children witnessing horrific violence exacted upon one parent by another is a significant factor in a sentencing decision." (quotation marks omitted)).

[¶37]  In sum, the court misapplied no legal principles in setting Gaston's basic sentence at thirty-five years, and it acted well within its discretion when, after considering the aggravating and mitigating factors, it set Gaston's maximum sentence at forty years.  *See De St. Croix*, 2020 ME 142, ¶ 5, 243 A.3d 880.

The entry is:

Judgment and sentence affirmed.

---

Robert Andrews, Esq. (orally), Portland, and James M. Mason, Esq., Brunswick, for appellant Noah Gaston

Aaron M. Frey, Attorney General, and Donald W. Macomber, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Cumberland County Unified Criminal Docket docket number CR-2016-488
FOR CLERK REFERENCE ONLY